RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0006P (6th Cir.)
File Name: 04a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROXANNE BELL,
     *Plaintiff-Appellant,*

     *v.*

UNITED STATES OF AMERICA,
     *Respondent-Appellee.*

No. 02-3295

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-02102—Patricia A. Hemann, Magistrate Judge.

Argued: July 31, 2003

Decided and Filed: January 7, 2004

Before: DAUGHTREY, MOORE, and SUTTON, Circuit
Judges.

---

### COUNSEL

**ARGUED:** David G. Umbaugh, UMBAUGH & SHARP,
Hudson, Ohio, for Appellant. Karen D. Utiger, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellee. **ON BRIEF:** David G. Umbaugh, UMBAUGH
& SHARP, Hudson, Ohio, for Appellant. Karen D. Utiger,
Teresa E. McLaughlin, UNITED STATES DEPARTMENT

OF JUSTICE, Washington, D.C., Annette G. Butler,
ASSISTANT UNITED STATES ATTORNEY, Cleveland,
Ohio, for Appellee.

---

### OPINION

---

KAREN NELSON MOORE, Circuit Judge. Many
employers are required to withhold various taxes from the
wages of their employees, which the employers hold in trust
until the taxes are paid over to the federal government.
Failure to forward these "trust fund" taxes to the government
violates § 6672(a) of the Internal Revenue Code ("Code"), 26
U.S.C. § 6672(a). This case involves a determination of what
constitutes a willful failure to pay those taxes. Plaintiff-
Appellant Roxanne Bell brought an action against the Internal
Revenue Service ("IRS") claiming a refund for $58,902.24
that was paid to satisfy an assessment made against the late
Willard R. Bell ("Bell"). She claimed that Bell did not
willfully fail to pay trust fund taxes, because his company's
relationship with its lending institution deprived him of
control over his company's funds such that he could not pay
the taxes. The district court granted the government's motion
for summary judgment. We **AFFIRM** because Bell's
voluntary commencement of a contractual relationship with
a bank that limited but did not deprive him of his ability to
pay the trust fund taxes and Bell's repeated payments to
creditors other than the federal government constituted a
willful failure under § 6672(a).

### I. BACKGROUND

Bell's difficulties with the IRS trace back to July 1990,
when Bell purchased Dyac Corporation, a floundering
company that manufactured industrial fasteners and shell
casings for munitions. It is not disputed that Bell was the
largest stockholder (51.5% of shares) and chief operating

officer of Dyac, nor is it disclaimed that Bell essentially ran the company on a day-to-day basis. Like any other business, Dyac was responsible for withholding federal wage, Federal Insurance Contribution Act ("FICA"), and Medicare taxes from employees' wages and keeping them in "trust" until it remitted them to the federal government on a quarterly basis. Dyac sufficiently met its trust fund tax obligations through the fourth quarter of 1991.

Dyac was struggling financially at and following its acquisition by Bell. Bank One, which had served as a lender to Bell during the acquisition process, provided Dyac with a revolving line of credit secured by security interests in Dyac's assets. As a consequence of financial problems throughout 1991, Bank One and Dyac amended their loan agreement several times. On September 30, 1991, Bank One and Dyac signed the "Fourth Amendment to the Credit and Security Agreement," which provided for the commencement of a lock-box arrangement. Bell and Dyac would place all cash receipts into the lock-box, which reduced Dyac's mounting indebtedness to Bank One. Then, Bank One would release additional loan advances into one or more of Dyac's three accounts with the Bank (a general operating account, a payroll account, and a trust fund account). In order to obtain these advances, Dyac had to submit a "borrowing certificate" to Bank One on a weekly and sometimes daily basis.

The issue of who controlled Dyac's funds is paramount. Bank One did not actually pay any of Dyac's bills under this arrangement; the Bank released the funds to Dyac's accounts, and Bell, as the chief operating officer, disbursed the money without further bank supervision. The Bank did control how much money flowed into Dyac's bank accounts, but the Bank did not actually control the company's financial outlays. Bell alleged in a deposition that Bank One had considerable authority over Dyac's accounts. He contended that Bank One often would refuse to advance funds until Dyac submitted a list of payees and Bank One would then edit the list so as to disallow certain payments. Bell also claimed that Bank One

"stepped over the line . . . exercising complete control over which obligations would be paid." Joint Appendix ("J.A.") at 307 (Bell Statement, Apr. 3, 1996). Bank One, however, disclaims this recounting of its relationship with Dyac.

Dyac's financial woes did not cease, and by January 1992, Dyac had overextended its credit with Bank One. On January 22, 1992, Dyac and Bank One entered into a Forbearance Agreement, which permitted Dyac to keep its doors open. The Forbearance Agreement perpetuated the lock-box arrangement, reduced the loan-advance ceiling, and explicitly addressed the payment of trust fund payroll taxes:

> The Borrower agrees that the first Revolving Loans available to it hereunder as of the date . . . hereof . . . and thereafter as may be necessary . . . shall be set aside and reserved for the payment of that week's projected payroll and "trust fund" payroll taxes, as the same are set forth on the Budget; and the Borrower hereby instructs the Bank without further instruction or request from the Borrower, to advance such Revolving Loans as deposits into the Borrower's payroll account maintained at the Bank and hereby further agrees that such sums shall be drawn upon solely for such purposes.

J.A. at 99 (Forbearance Agreement). At some point after December 1991, Bank One stopped approving loan advances to cover the payroll trust fund taxes. The timing of Bank One's cessation of trust fund loan advances is in dispute. In a letter/memorandum dated April 3, 1996, Bell claimed that in "mid December [1991]" Bank One "began excluding Payroll Trust Items" from the items approved on the borrowing certificates. J.A. at 306-07 (Bell Mem.). However, a Bank One loan officer noted in a memo requesting approval for the Forbearance Agreement on January 22, 1992, that the Bank would advance $16,500 as part of the agreement, partially to be used for trust fund taxes.

On February 12, 1992, Bank One denied Dyac's request for additional loan advances to pay off Dyac's past trust fund tax obligations. Bell sent Bank One a fax that requested an advance for "past trust fund obligations which the Company has not been able to obtain the release of our funds from the Bank to be able to discharge." J.A. at 280 (Facsimile Dated 02/12/92). The fax specifically mentioned over $51,000 in FICA trust fund taxes that were in arrears for most of January. Gary Sprague ("Sprague"), the Bank One loan officer in charge of the Dyac accounts, denied the request because Bank One had already lent Dyac money for payroll taxes in January and this additional request represented an overadvance that was not covered by the Forbearance Agreement.

During January, February, and the first week of March in 1992, Dyac failed to pay to the IRS any trust fund taxes. Dyac had thus failed to pay six weeks of trust fund taxes in 1992 *before* the February 12 refusal by Bank One to advance any funds for the past tax debt. Dyac then failed to pay any taxes for the rest of February and March. Yet, Dyac still continued to disburse funds, as it withdrew over $1.37 million from its three bank accounts during that time. Additionally, Dyac continued to pay money to other creditors during the first quarter of 1992, as Thomas Small, the Vice-President of Dyac, stated that Dyac satisfied its obligations to vendors, such as the phone company, the electric company, and several steel suppliers while the delinquent taxes accrued.

Dyac filed for bankruptcy on March 6, 1992. On March 17, 1997, the IRS made an assessment of $58,902.24 against Bell under § 6672 of the Code for the full amount of the unpaid trust fund tax debt from the first quarter of 1992. *See* 26 U.S.C. § 6672. Bell paid the assessment and requested a refund, which the IRS ultimately denied in September 1997.[1]

---

[1]The total amount owed by Bell equaled $66,729.05, including interest and fees. Bell and his estate resolved the debt through a series of payments: (1) Bell applied a credit of $8,203.00 from a previous

Following Bell's death, Roxanne Bell brought this refund action on September 3, 1999,[2] as an individual, as executrix of Bell's Estate, and as Trustee of the Willard R. Bell Living Trust. Upon consent of the parties, the case was transferred to a U.S. Magistrate Judge for disposition. 28 U.S.C. § 636(c)(1). The Government filed a motion for summary judgment, and in response Roxanne Bell conceded that Bell was responsible for paying the trust fund taxes but denied that he willfully failed to pay the taxes. The magistrate judge granted the Government's summary judgment motion, concluding that because Bell used Bank One's loan advances to pay creditors other than the IRS and because Bell knew that the trust fund taxes were not being paid, as evinced by his complaints that he needed to receive additional loans to pay the taxes, he was responsible and willfully had failed to pay the taxes. The court also rejected Roxanne Bell's argument that there was "reasonable cause" for Bell's failure to pay the taxes, such that he should be excused from his liability. The district court had proper jurisdiction over Roxanne Bell's

---

overpayment on April 15, 1997; (2) Bell made a $1,000.00 payment on May 7, 1997; (3) Bell applied a credit of $1,417.00 from a previous overpayment on April 15, 1998; (4) Bell's estate made a payment of $346.00 on June 10, 1998; and (5) Bell's estate made a payment of $55,806.25 on November 7, 1998. Bell overpaid by $43.35, which the IRS refunded in December 1998. On April 29, 1997, Bell filed a timely refund claim for the $8,203.00. He subsequently amended the refund claim to contest also the $1,000 payment made on May 7, 1997. The IRS denied the consolidated claim on September 4, 1997. Roxanne Bell did not file a refund claim for the money paid in April, June, and November 1998 until after she filed the action in this court. On May 1, 2000, Roxanne Bell filed a claim for the entire $58,902.24. Her claim regarding the $1,417.00 credit applied to the debt on April 15, 1998 was untimely because it was filed more than two years after the tax was paid. *See* 26 U.S.C. § 6511(a). The IRS denied the claim on November 16, 2000.

[2]The action was timely because it was filed within two years of the denial of the claim for refund. *See* 26 U.S.C. § 6532(a)(1).

initial claim pursuant to 26 U.S.C. § 1346(a)(1),**[3]** and this court has jurisdiction over her timely appeal pursuant to 28 U.S.C. §§ 636(c)(3), 1291.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo the district court's decision to grant summary judgment. *Allen, Inc. v. CSX Transp.*, 325 F.3d 768, 771 (6th Cir. 2003). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). The reviewing court must assess the available proof to determine whether there is a genuine factual issue that justifies a trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, the court must view the facts and all the inferences

---

**[3]** The Government renews its contention that the district court did not have jurisdiction over Roxanne Bell's claim regarding the rejection of the second refund claim filed in May 2000. In her complaint, Roxanne Bell sought to recover the full amount, $58,902.24. The complaint, though, only mentioned the April 1997 refund claim that the IRS denied in September 1997. The government correctly stated in its answer that the district court at that point could not hear the claim because Roxanne Bell did not comply with 26 U.S.C. § 7422(a), which states that "[n]o suit . . . shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the [IRS]." 26 U.S.C. § 7422(a). The government failed to file a motion to dismiss on these grounds. The government next filed a motion for summary judgment in November 2001, arguing again that the second refund claim was not properly before the district court. However, by this point, more than a year had passed since the IRS had rejected Roxanne Bell's second refund claim, and the district court thus could properly consider the claim. The government asserts now that Roxanne Bell's complaint is faulty. This argument fails, however, because while Roxanne Bell's complaint may have been premature earlier in the litigation due to her failure to file a refund claim with the IRS, she did eventually exhaust her administrative remedy, and Roxanne Bell's complaint sufficiently states a claim for the full $58,902.24 over which the district court has jurisdiction.

drawn from such facts in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The moving party has the burden of establishing that no genuine issue of material fact exists, but the nonmoving party also has a responsibility "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Ultimately, the court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### B.  The Trust Fund Tax Liability Scheme

The Code requires most employers to withhold Social Security, Medicare, and federal income taxes from their employees' wages. *See* 26 U.S.C. §§ 3102, 3402. Section 7501 provides that the withheld money is held in trust for the United States until paid to the Treasury on a quarterly basis. 26 U.S.C. § 7501(a); *Slodov v. United States*, 436 U.S. 238, 243 (1978). The withholding taxes "are part of the wages of the employee, held by the employer in trust for the government"; the employer, as a function of administrative convenience, extracts money from a worker's paycheck and briefly holds that money before forwarding it to the IRS. *Gephart v. United States*, 818 F.2d 469, 472 (6th Cir. 1987). A delinquency in trust fund taxes thus is not simply a matter between the IRS and an employer, but rather involves employee wages. The significant responsibility of Dyac or any other employer is summed up by then-Judge Cardozo's famous statement that "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

Thus, it should come as no surprise that Congress created a rigorous penalty for those who fail to remit the withheld

trust fund taxes to the government. Section 6672(a) provides that "any person" who is required to collect the taxes and willfully fails to pay them over to the government is *personally* liable for 100% of the delinquent taxes. 26 U.S.C. § 6672(a).[4] The statute's punitive nature comes not from an increased monetary penalty, as the responsible party is not liable for an amount that is higher than the delinquent tax balance, but rather from personal, as opposed to corporate, liability. Section 6672 thus exists "to protect the government against losses by providing it with another source from which to collect the withheld taxes." *Gephart*, 818 F.2d at 473; *see also Bolding v. United States*, 565 F.2d 663, 669 (Ct. Cl. 1977) ("Congress has allowed the IRS more stringent protective devices to insure collection of payroll taxes than in the case of many other taxes.").

We, in step with other circuits, have held that an individual is liable under § 6672(a) if he or she:  1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government. *See Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir. 1993); *McDermitt v. United States*, 954 F.2d 1245, 1250 (6th Cir. 1992).  To obtain a refund of a previously paid assessment, a responsible person has the burden of showing that the assessment is inaccurate, "because

---

[4]Section 6672 (a) reads:
Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). *See also Slodov v. United States*, 436 U.S. 238, 245 (1978) ("[A]n employer-official or other employee responsible for collecting and paying taxes who willfully fails to do so is subject to . . . a civil penalty equivalent to 100% of the taxes not collected or paid . . . .").  Criminal penalties are also available but are not at issue in this case.

he has placed at issue an assessment which is presumed correct." *Collins v. United States*, 848 F.2d 740, 742 (6th Cir. 1988).  This burden entails "proving, by a preponderance of the evidence, that he was not a responsible person who willfully failed to pay over the withheld taxes." *Id.* Roxanne Bell thus has to demonstrate that a genuine issue of material fact exists regarding her late husband's responsibility for the taxes and his willful failure to pay them in order to show that the district court erred in its judgment.

## C.  Responsibility and Willfulness

We first consider whether Bell was a responsible party. The determination of responsibility focuses on the "degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors." *Gephart*, 818 F.2d at 473.  Courts generally look at factors such as the duties of the officer as described by the corporate by-laws and the ability of the individual to sign checks for the corporation.  *Id.*  Both parties here have conceded that Willard Bell was a responsible party, as he was the chief shareholder and principal actor for Dyac, and there is accordingly no genuine issue of material fact on this point.

The question of whether Bell willfully neglected to pay over the withheld trust fund monies is more complicated. Under our basic definition of willfulness, "[a] responsible person who makes a deliberate choice to voluntarily, consciously, and intentionally pay other creditors rather than make tax payments[] is liable for willful failure." *Collins*, 848 F.2d at 742.  The responsible party need not exhibit an intent to defraud the IRS or some other evil motive; all that is necessary to demonstrate willfulness is the existence of an intentional act to pay other creditors before the federal government.  *See id.*; *Calderone v. United States*, 799 F.2d 254, 260 (6th Cir. 1986).

We have held in the past that proof of a responsible person's knowledge of payments to other creditors and awareness of the failure to pay the trust fund taxes is enough to trigger liability. In *Collins*, we held that even though the plaintiff was "a sympathetic figure," who relied on another's promise to pay off the taxes, he still acted willfully because he knew that the taxes were not being paid and he diverted funds, which could have been used to offset the tax debt, to cover other business expenses. *Collins*, 848 F.2d at 742. In *Gephart*, we held that a corporate general manager willfully failed to pay the trust fund taxes, even though the manager might have been fired for disobeying his superior's orders not to pay the taxes, because the manager was aware of an unpaid tax debt yet continued to disburse funds to other creditors. *Gephart*, 818 F.2d at 475.

Similarly, viewing the evidence in the light most favorable to Bell, it is clear that Bell knew about the delinquent taxes and voluntarily paid other creditors before paying the federal government. The fax from February 12, 1992, in which Bell requests a $51,000 loan advance to pay the IRS for past trust fund withholdings, demonstrates that he knew of the tax delinquencies. But despite this clear awareness of the trust fund tax debt, Bell continued to pay other creditors. Dyac's bank records indicate that it withdrew $619,850 from its accounts in the month of February, J.A. at 158, 172, 177, and Bell's attorney disclosed at oral argument that Dyac paid its utility and supplier bills while the trust fund taxes went unpaid.

The crux of Bell's argument on appeal is that Bell could not have willfully failed to pay the taxes, because the funds were "encumbered" by the Bank such that Bell would have paid the taxes but for the Bank's refusal to permit him to apply the loan advances toward the trust fund delinquency. In *Huizinga v. United States*, 68 F.3d 139 (6th Cir. 1995), we held that liability under § 6672(a) hinges upon whether funds that could be used to pay down the tax debt are "available" or "unencumbered." *Id.* at 145; *see also United States v. Kim*,

111 F.3d 1351, 1358 (7th Cir. 1997) (recognizing our use of "unencumbered" in assessing willfulness). We stated that a responsible individual is willful if he "fails to use *all unencumbered funds* that come into his possession thereafter to pay the delinquent taxes." *Huizinga*, 68 F.3d at 145 (emphasis added). The encumbrance in *Huizinga* was a state statute, the Michigan Building Contract Fund Act, which statutorily obligated a contractor to hold in trust monies used to fund construction projects in order "to protect the owner and those whose labor and materials make the performance of a construction contract possible." *Id.* (quotation omitted). Here, Bell was contractually obligated to Bank One, and he had to submit borrowing certificates to garner loan advances, but no statute or ordinance prevented Bell from paying the trust fund taxes. Consequently, we are presented with a novel question of whether a debtor's voluntary entrance into a contractual agreement that restricts the debtor's use of loan advances in a lock-box arrangement encumbers those loan proceeds such that the debtor cannot be said to have failed willfully to meet his or her trust fund obligations because he or she had limited control over the funds.

In holding that such a contractual obligation does not constitute an encumbrance that relieves a responsible individual of liability under § 6672(a), we start with the definition of "encumbered" presented in *Huizinga*. There, we drew our definition of "encumbered" from language in an Eighth Circuit case when we wrote, "Funds are considered encumbered 'only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and [the] legal obligation is superior to the interest of the IRS in the funds.'" *Huizinga*, 68 F.3d at 145 (alteration in original) (quoting *Honey v. United States*, 963 F.2d 1083, 1090 (8th Cir.), *cert. denied*, 506 U.S. 1028 (1992)). The *Honey* opinion references a slightly different definition of encumbered offered by the Bankruptcy Court for the Eastern District of Michigan in *In re Premo*, 116 B.R. 515 (Bankr. E.D. Mich. 1990). The

*Honey* court first quoted the *Premo* decision, which set forth the following definition:

> Where the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS, the funds are regarded as encumbered if those restrictions preclude the taxpayer from using the funds to pay the trust fund taxes.

*Premo*, 116 B.R. at 535. Then, the *Honey* court distilled the *Premo* definition into the language that we quoted in *Huizinga*. Although the *Honey* court ostensibly adopted the *Premo* definition of "encumbered,"[5] the *Honey* court's distillation of the *Premo* test is distinct from the precise language used in *Premo*.[6] The *Premo* language is broader than the language we culled from the *Honey* opinion; the *Premo* formulation includes funds that are "subject to restrictions imposed by a creditor" to whom the debtor is contractually bound, whereas the *Honey* formulation that we adopted in *Huizinga* labels as "encumbered" only those funds limited by "legal obligations."[7] Additionally, the *Premo* test,

---

[5] The Eighth Circuit's use of the *Premo* test is strange, because in doing so the court seemingly employed a more encompassing definition of "encumbered" that would allow a greater number of responsible persons to avoid liability under § 6672(a), despite the Eighth Circuit's initial statement that its definition of "*un*encumbered" "should be a broad one in order to ensure that the taxes are paid." *Honey v. United States*, 963 F.2d 1083, 1090 (8th Cir.).

[6] The Ninth Circuit in *Purcell v. United States*, 1 F.3d 932 (9th Cir. 1993), labeled the *Honey* and *Premo* formulations as "competing standards." *Id.* at 939. The court asserted that the *Premo* standard employed a "relatively relaxed definition of 'encumbered funds,'" which swept more broadly than the language we quoted from *Honey*. *Id.*

[7] Even the *Premo* court noted that "[t]he existence of a superior lien, without more, does not create an encumbrance for purposes of § 6672[]], [as] there must be conditions imposed by the lender which render the

unlike the *Honey* test, counts as encumbrances those restrictions that are not legally enforceable, but "may be practically irresistible because they arise out of the disparity of bargaining power as between the taxpayer and its source of financing." *See Purcell v. United States*, 1 F.3d 932, 938-39 (9th Cir. 1993).

We decline to accept the *Premo* definition. In writing *Huizinga*, we quoted the *Honey* court directly and did not mention the *Premo* case at all. It is incorrect to assume that by incorporating the narrower *Honey* formulation of "encumbered" into our case law, we implicitly accepted the broader *Premo* test when we did not even quote the *Premo* language. Furthermore, the narrower definition of "encumbered" that we accepted in *Huizinga* best fits § 6672(a), which ensures the timely payment of trust fund obligations to the government

This still leaves open the question of whether Dyac's contractual relationship with Bank One "legally obligated [Dyac] to use the funds for a purpose other than satisfying the preexisting employment tax liability . . . ." *Huizinga*, 68 F.3d at 145. It is clear from *Huizinga* that a state statute mandating the creation of a construction-contract trust constitutes an encumbrance, but it is not clear whether a contract, while a legal instrument, is a legal obligation within this context. In *Kalb v. United States*, 505 F.2d 506, 510 (2d Cir. 1974), *cert. denied*, 421 U.S. 979 (1975), the responsible persons seeking a refund voluntarily entered into a contract with their bank under which the responsible persons asked the bank to forward funds to pay the trust fund debt, but at one point the bank refused to approve the loan. The responsible persons had the power to disburse funds, and the court noted that they were free to rescind their contract with their bank at any

---

funds unavailable for payment to the IRS of the trust fund taxes for the time period in question." *In re Premo*, 116 B.R. 515, 535 n.34 (Bankr. E.D. Mich. 1990).

point. *Id.* The court stated, "[t]o permit corporate officers to escape liability under section 6672 by entering into agreements which prefer other creditors to the government would defeat the entire purpose of the statute." *Id.* It concluded, "We cannot imagine that in any other context a trustee could avoid his obligations by entering into an agreement by which funds entrusted to him are used to pay his other obligations." *Id.*

We agree with this reasoning. Corporate funds should not be considered encumbered simply because a *contractual* obligation with a lender or other creditor impacts a company's ability to use its assets, receivables, or loan advances with complete freedom. If this were the case, then nearly every responsible person involved with a failing company in the midst of credit problems or intricate loan arrangements would be able to avoid a finding of willfulness and thus evade liability. Such a result would undermine the purpose of § 6672 in assuring that trust fund taxes are paid to the government.

Thus, given the context of *Huizinga* in which we adopted our definition of "encumbered," and in light of the risk of eviscerating § 6672(a) by permitting voluntary encumbrances to interfere with the payment of trust fund taxes, we hold that funds are encumbered only when certain legal obligations, such as statutes, regulations, and ordinances, impede the freedom of a company to use its funds to fulfill its trust fund tax debts. Voluntary contractual obligations, such as the lock-box arrangement at issue in this case, do not encumber funds so as to prevent a willful failure to pay trust fund taxes.

Roxanne Bell responds that the above view ignores the reality that contractual obligations can often exert as much force on a responsible person as a legal obligation. During oral argument, Roxanne Bell's attorney contended that, because Bank One only advanced Dyac loan proceeds to pay its utilities and suppliers and refused to forward money to cover the delinquent tax debt, Bell could not pay the taxes

unless he violated the terms of his contract with Bank One, thereby opening himself up to a breach of contract suit. Such a contention misunderstands the bedrock purposes of § 6672(a); meeting federal trust fund taxation requirements trumps whatever adverse consequences might result from failing to navigate the web of various creditor-oriented obligations in which a troubled company will find itself entangled. For example, the Ninth Circuit considered a similar factual situation, in which a lock-box arrangement gave a debtor company only controlled access to loan proceeds and only on a request-by-request basis. *Purcell v. United States*, 1 F.3d 932 (9th Cir. 1993). The court held that even under the relaxed *Premo* standard, the funds were not encumbered because there were no "particular restrictions placed on the Company's use of funds" once the new funds were advanced. *Id.* at 939. In *Bradshaw v. United States*, 83 F.3d 1175 (10th Cir. 1995), a creditor bank required a failing company to get authorization before disbursing any company funds by check, and the creditor bank then refused to release funds for payments of taxes. *Id.* at 1180 n.5. The court wrote that rather than evade his responsibility to pay the taxes, "Bradshaw could have resigned his position with [the company] or refused to sign any checks and shut down the business." *Id.* at 1181; *see also Hochstein v. United States*, 900 F.2d 543, 549 (2d Cir. 1990) (ruling that adverse consequences, such as losing one's job, "simply are no excuse for failing to collect and pay" trust fund taxes).

Here, Bank One placed no restrictions on how Dyac could spend its money once it received the loans, although it did exercise control before the loan was made. Once Dyac received the money from the bank, it could have used the loan proceeds to pay off its trust fund debt. Counsel's argument that Bank One choked up the supply of money so that it tied Bell's hands distorts the facts. Bank One refused only to forward more money to cover *accrued* payroll trust taxes after February 12th. By that point, Bell had already willfully failed to pay six weeks of payroll taxes in January and early February, and he had disbursed six weeks of loan advances to

creditors other than the federal government. This point is bolstered by the fact that Bell spent over $1.5 million from Dyac's three accounts in the first few months of 1992. While it is true that Bank One may have refused to earmark certain loan advances to pay past tax debts at some point in time, the withdrawals from the bank account demonstrate that there were at least some funds available to pay the trust fund taxes, even if doing so somehow violated Dyac's contract with Bank One.

It is no excuse now to argue that encumbrances impeded Bell's ability to remit the trust fund taxes, as Bell could have shut down the company, suspended operations, filed for bankruptcy, applied for a bridge loan from another lender, or simply violated his contract with Bank One instead of failing to fulfill his tax debt. None of these options is attractive or enviable, but in the eyes of § 6672(a), they are the correct choices. As we have stated, "It is no excuse that . . . the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern — the government cannot be made an unwilling partner in a floundering business." *Brewery, Inc. v. United States*, 33 F.3d 589, 593 (6th Cir. 1994) (quotation omitted).

Additionally, a key distinction between contractual obligations and the types of legal obligations that can encumber funds is that in the former situation, a plaintiff voluntarily and willfully enters into the contractual arrangement that limits the funds. For example, in *Bradshaw*, the court noted that although the plaintiff lacked the power to pay the trust fund taxes because the bank would not give its approval, "this lack of power was the direct result of the Agreement which Bradshaw had negotiated and entered into on behalf of [the company]." *Bradshaw*, 83 F.3d at 1181. Here, Bell entered into the Fourth Amended Agreement, which set up the lock-box system, and the Forbearance Agreement, which perpetuated it. Bell voluntarily put himself and his company in a position in which it was not only plausible, but also quite foreseeable, that he would overextend

his loan advances and Bank One would refuse to advance any more loans, even to pay off the taxes. The limitations placed on Dyac's funds were a result of Dyac's and Bell's willful entry into various loan agreements and should not constitute encumbrances that abrogate a finding of willfulness. Furthermore, even if Bank One had complete dominion over Dyac's finances such that it controlled all financial outlays and disbursed funds to vendors and other creditors without Dyac's intervention, the funds could still not be considered encumbered because Dyac had voluntarily entered into a contract giving up its control.[8] To hold otherwise would be

---

[8]Roxanne Bell also urges us to conclude that Bell had "reasonable cause" to be delinquent in paying his taxes such that he should be excused from liability. Contrary to the Government's assertion, we have never decided whether there exists a reasonable-cause exception to liability for willful failure under § 6672(a). In our only case on point, *Brewery, Inc. v. United States*, 33 F.3d 589 (6th Cir. 1994), we simply made the commonsense comparison between the text of § 6672(a), which does not contain a reasonable-cause exception, and the statutory provision at issue in *Brewery*, which did contain an explicit reasonable-cause exception. *Id.* at 593.

We do not resolve this question here. We note that at least one circuit has held that reasonable cause exists where "(1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control." *Finley v. United States*, 123 F.3d 1342, 1348 (10th Cir. 1997); *see also Howell v. United States*, 164 F.3d 523, 526 (10th Cir. 1998). The desire for an exception stems from a fear that § 6672(a) has become a strict-liability statute, prompting concern from some courts. *See generally, Phillips v. IRS*, 73 F.3d 939, 943 (9th Cir. 1996); *Williams v. United States*, 931 F.2d 805, 811 (11th Cir. 1991).

However, there are extremely persuasive arguments against judicially incorporating a reasonable-cause exception. First, Congress explicitly inserted a reasonable-cause exception into other penalty provisions of the Code, but not § 6672(a). *Compare* 26 U.S.C. §§ 6651(a)(3), 6652(c)(3), 6656(a); 26 C.F.R. § 301.6651-1(c). Second, in view of the unique trust nature of the delinquent taxes at issue in § 6672, a rule rejecting a reasonable-cause exception is desirable, even if it produces harsh results in some cases, because the withheld payroll taxes are misdirected. Third, the penalty for § 6672 is non-punitive, but rather simply attempts to recoup the full amount of the delinquent taxes. Fourth, it is illogical for a jury to find that an individual is not liable under § 6672(a) because

to allow employers an easy escape from federal taxation responsibilities.

### III.  CONCLUSION

Taking all the facts and inferences from a viewpoint favoring Bell, we conclude that there is no genuine issue of material fact regarding the availability of the funds to pay the taxes and Bell's willful failure to pay the trust fund taxes. Consequently, the judgment of the district court is **AFFIRMED**.

---

elements existed beyond that person's control directly following the jury's predicate finding of responsibility and willfulness that would make the invocation of a reasonable-cause exception necessary. Fifth, several other circuits have rejected such a reasonable-cause exception. *Olsen v. United States*, 952 F.2d 236, 240-41 (8th Cir. 1991); *Harrington v. United States*, 504 F.2d 1306, 1316 (1st Cir. 1974); *Pac. Nat'l Ins. Co. v. United States*, 422 F.2d 26, 33 & n.19 (9th Cir.), *cert. denied,* 398 U.S. 937 (1970); *Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821 (1970).

We need not take a side in this debate because even if a reasonable-cause exception should exist in some context, it certainly does not apply here. Bell did not make reasonable efforts to use Bank One's loan advances in the early part of January and February to decrease his tax delinquency. Moreover, Bell was not stymied by circumstances outside his control, because Bell had free reign over the loan proceeds once Bank One advanced them and he also had command over Dyac's contract with Bank One. A reasonable-cause exception may exist, but no taxpayer, including Bell, has "yet carried that pail up the hill." *Bowen v. United States*, 836 F.2d 965, 968 (5th Cir. 1988).