**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0977n.06

**Nos. 10-2080, 10-2319**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Sep 04, 2012*

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| ROGER BYRNE, | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| UNITED STATES OF AMERICA, | ) COURT FOR THE EASTERN |
| | ) DISTRICT OF MICHIGAN |
| Defendant/ Counterclaim Plaintiff-Appellee, | ) |
| ERIC C. KUS, | ) |
| Additional Defendant on Counterclaim-Appellant, | ) |
| BERNARD D. FULLER, | ) |
| Additional Defendant on Counterclaim. | ) |

**Before: COOK, WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Appellants Roger Byrne and Eric Kus appeal the

district court's grant of summary judgment in favor of Appellee, United States of America. We

reverse.

**I.**

In October 1998, a small group of investors employed at Eagle Picher Corporation purchased

a division from their employer for approximately $15 million, which they re-named Eagle Trim, Inc.

Eagle Trim operated as an automotive supplier with General Motors (GM) as its principal customer. Included among Eagle Trim's investors were Byrne, Kus, Bernard Fuller, and Gary Anderson.

The investors obtained a substantial portion of the $15 million purchase price from General Motors Acceptance Corporation Business Credit LLC, (GMAC), the "credit facility" of GM. Through Kus's negotiation, Eagle Trim recieved $8 million in loans and a revolving line of credit – the maximum amount of which was calculated based on the company's current accounts receivable and inventory – secured by a lien upon all of Eagle Trim's assets, tangible and intangible. As a security precaution for GMAC's loan advances, all Eagle Trim receivables were deposited in a "lock box" account that GMAC controlled. Eagle Trim borrowed money against the line of credit to pay operating expenses, including payroll and payroll taxes. In order to borrow these funds from GMAC, Eagle Trim periodically completed a "borrowing base certificate," that listed its current accounts receivable and inventory.

Anderson and Kus each owned approximately 40% of Eagle Trim's stock. Kus also held the titles of Eagle Trim Chairman and Chief Executive Officer (CEO). As Chairman and CEO, Kus's responsibilities included strategic planning for Eagle Trim, acquisitions, business growth, sales, marketing, contact with major customers, development of new products, and extension of product lines. Kus also frequently approved requests for further extensions of credit from GMAC.

Byrne, a minority shareholder of Eagle Trim who owned 1.5% of the company's stock, served as Eagle Trim's president and general manager. Byrne's responsibilities included handling Eagle Trim's day-to-day operations, manufacturing oversight, and engineering development. Subject to Kus's approval, Byrne determined how much employees were to be paid, as well as whether or

not they would receive bonuses. Byrne reported to Kus and Anderson; everyone else at Eagle Trim, including the approximately 400 employees at Eagle Trim's primary facility in Kalkaska, Michigan, reported to Byrne. Although the Kalkaska employees reported to Byrne, he spent most of his time at the company's facility in Inkster, Michigan, leading the sales team.

Both Byrne and Kus had the ability to hire and fire employees as well as signature authority on all Eagle Trim bank accounts and the borrowing base certificates that Eagle Trim submitted to GMAC. Byrne and Kus also comprised two of Eagle Trim's three-member Board of Directors.

In 1998, Fuller was the account manager at Eagle Picher. Once Eagle Trim was formed, Fuller became Eagle Trim's controller and reported directly to Byrne and Kus. Unlike Byrne and Kus, Fuller worked primarily at the Kalkaska location. As part of his training for the controller position, an accounting firm, Weber Curtin & Drake (WCD), provided Fuller with a Circular E, a document that explained how to prepare and file employee payroll/trust fund taxes for the IRS. In his capacity as controller, Fuller was responsible for the day-to-day financial affairs of the company and was authorized to submit borrowing certificates to GMAC to obtain operating funds. Fuller also handled the treasury functions of Eagle Trim, which included the filing and payment of employee trust fund taxes. Additionally, Fuller had unfettered discretion over Eagle Trim's financial activities, and exercised full control over the payment of checks. Although Byrne and Kus were responsible for Eagle Trim's income tax returns, Fuller prepared and signed Eagle Trim's payroll tax returns.

In early 1999, months after Fuller's appointment as Eagle Trim controller, the IRS assessed Eagle Trim with a penalty of approximately $30,000. The penalty was due to Fuller paying Eagle Trim's payroll taxes bi-weekly, instead of weekly as required by IRS regulations. Byrne and Kus

asked WCD to assist Fuller in reviewing the purported late payments. Fuller informed Byrne and Kus that WCD deemed the penalty an IRS error.

The following year, in January 2000, Eagle Trim hired an accountant, Kelly Gillman, to assist Fuller with his duties as controller. One month later, Kus and Byrne were informed that Fuller had paid Eagle Trim's payroll taxes two weeks late. Around this time, Kus also learned that Fuller was not paying health insurance premiums for the 75-100 employees at Eagle Trim's subsidiary in South Bend, Indiana. In July 2000, Kus hired Andrew Jones to serve as Chief Financial Officer of Eagle Trim and to supervise Fuller. Fuller then reported to Jones who reported to both Byrne and Kus on all of the financial aspects of Eagle Trim.

In October 2000, WCD conducted a four- to six-week audit of Eagle Trim's financial records. As part of the audit, WCD had an accountant physically on site at Eagle Trim's Kalkaska facility who worked directly with Eagle Trim's accounting department. On December 11, 2000, WCD issued a clean audit for Eagle Trim that stated the company was in compliance with generally accepted accounting principles and up-to-date with its payroll tax obligations.

Despite WCD's clean audit, in January 2001, GMAC auditors discovered that Eagle Trim's reported revenue was significantly overstated and the company, rather than being profitable, was losing money. According to GMAC's review, Fuller had falsified certain receivables by adding digits to the invoice. For example, an $8,000 invoice was recorded as an $80,000 receivable, and another receivable had been overstated by $792,000.

Unable to rely on the figures that Eagle Trim had been providing, GMAC cancelled its lock box arrangement with Eagle Trim. Eagle Trim's accounts at National City Bank were also cancelled

because they were overdrawn. However, because the shutdown of Eagle Trim's operations would prevent GM's production lines from manufacturing cars in a timely manner, GM began financing Eagle Trim's operations by issuing its own checks for raw materials, as well as employee payroll. GM also guaranteed payments to Eagle Trim's vendors until the company could set up new bank accounts.

On January 31, 2001, GMAC and Kus, on behalf of Eagle Trim, entered into a forbearance agreement whereby GMAC agreed to provide Eagle Trim with the financing it needed to continue operations and to forbear from enforcing its remedies under the loan agreement. In exchange, Eagle Trim paid GMAC a $25,000 "forbearance fee," and promised that "a third party reasonably acceptable to [GMAC]" would be in control of Eagle Trim's "cash receipts and disbursements." Under this arrangement, new bank accounts for Eagle Trim were set up at Irwin Union Bank. Kus was not an authorized signer on the Irwin Union Bank accounts, and it is unclear from the current record whether Byrne had signature authority on these accounts.

Pursuant to the forbearance agreement, GM retained third party BBK Ltd., a crisis management company, to manage Eagle Trim and ensure that production of GM's parts remained uninterrupted. At this time Fuller was immediately stripped of all financial responsibility.

In February 2001, BBK informed Byrne and Kus that trust fund taxes for the second, third, and fourth quarters of 2000 had not been paid. Byrne and Kus then terminated Fuller. Before Fuller left Eagle Trim he sought approval to pay the delinquent taxes; BBK refused.

At this point, Byrne and Kus did not know the full amount of Eagle Trim's outstanding tax liability; GMAC and BBK estimated the arrearage at $150,000. Toward the end of February 2001,

5

Eagle Trim engaged Amherst Partners to evaluate Eagle Trim's finances and determine the full extent of Eagle Trim's outstanding tax obligation. Amherst engaged Tony Pierfelice of ARP Services, LLC, to assist with the investigation and perform an onsite account reconciliation at Eagle Trim. The reconciliation proved difficult, however, as Pierfelice found checks made out to the IRS in Fuller's old office, as well as a large number of checks marked "non-sufficient funds."

On April 25, 2001, Byrne filed, on Eagle Trim's behalf, a voluntary petition for bankruptcy with the United States Bankruptcy Court for the Eastern District of Michigan. Due to the conditions of the financial records, it took several months to gain a complete understanding of the full extent of Eagle trim's tax liability. It was not until ARP prepared the bankruptcy schedules that it was able to provide an estimate of the full amount of trust fund taxes due to the IRS.[1]

In July 2005, the IRS, pursuant to 26 U.S.C. § 6672(a), assessed Byrne and Kus with a penalty in the amount of $865,635.74, the amount of Eagle Trim's unpaid trust fund taxes. Byrne paid $1,000 to the IRS and then filed a claim for refund of the amount paid as well as an abatement of the entire assessment. After the IRS denied Byrne's abatement request, he filed the instant lawsuit against the United States. In response, the United States filed a counterclaim against Byrne, and third-party claims against Fuller and Kus, seeking a judgment for the assessment balance. Byrne then filed a cross-claim against Fuller and Kus seeking contribution and indemnification. Kus also filed a cross-claim against Byrne and Fuller for contribution and indemnification.

---

[1]Bryne and Kus were successful in working with Eagle Trim's bankruptcy lawyers to ensure that funds recovered by the bankruptcy estate of Eagle Trim could be paid to the IRS.

On October 5, 2007, Byrne, Kus, and the government filed cross-motions for summary judgment. Fuller stipulated to the entry of judgment in favor of the government on February 28, 2008. The district court granted the United States's motion on May 12, 2008. Bryne and Kus appealed that order but the parties agreed to dismiss the appeal because the order appealed from did not specify the amount of damages that Byrne and Kus owed to the United States. On July 2, 2010, the United States filed a motion for judgment claiming damages in the amount of $594,774.58, plus statutory additions and interest, for unpaid tax liabilities. Byrne and Kus did not file a response to the government's motion and the court entered judgment as requested by the government on August 17, 2010. This appeal followed.[2]

## II.

This court reviews a district court's grant or denial of summary judgment *de novo. Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). The moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence must be

---

[2]The government initially argues that we lack jurisdiction to hear this appeal because the parties'cross-claims against each other and Fuller have not been resolved by the district court, making this appeal interlocutory in nature. Because the appellants have since voluntarily dismissed the remaining cross-claims, the government's argument is moot.

viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in the non-movant's favor. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

## III.

Under 26 U.S.C. § 6672(a):

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

"[A]n individual is liable under § 6672(a) if he or she: 1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government." *Bell v. United States*, 355 F.3d 387, 393 (6th Cir. 2004). The taxpayer bears the burden of demonstrating that he or she does not satisfy these elements. *Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir. 1993). To determine whether an individual is "responsible," we focus on "the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors." *Gephart v. United States*, 818 F.2d 469, 473 (6th Cir. 1987). Factors indicative of responsibility include:

1) the duties of the officer as outlined by the corporate by-laws;
2) the ability of the individual to sign checks of the corporation;
3) the identity of the officers, directors, and shareholders of the corporation;
4) the identity of the individuals who hired and fired employees;
5) the identity of the individuals who are in control of the financial affairs of the corporation.

*Kinnie*, 994 F.2d at 283.

8

We agree with the district court that the undisputed facts demonstrate Kus and Byrne were responsible persons under § 6672(a). In his capacity as Chairman and CEO of Eagle Trim, Kus had the authority to hire and fire other employees, signature authority on Eagle Trim's bank accounts, and the authority to borrow money on Eagle Trim's behalf. As Eagle Trim President, Byrne also had this authority. In addition, Byrne signed federal income and payroll tax returns and his electronic signature was used on employee payroll checks.

Byrne and Kus both contend that they were not responsible because Fuller exercised control over all accounting functions, they were frequently off-site at other facilities, and they reasonably relied on outside professionals to oversee the company's finances. As the district court correctly pointed out, however, "one who possesses significant control over the company's financial affairs may not escape liability by delegating the task of paying over the taxes to someone else." *Id.* at 284.

Despite being responsible persons, Byrne and Kus will not be liable under § 6672(a) unless their failure to pay trust fund taxes was willful. Mere negligence is insufficient. *Gephart*, 818 F.2d at 475. For a responsible person to be deemed willful, he or she must have either "deliberately or recklessly disregarded facts and known risks that the taxes were not being paid[,]" *Calderone v. United States*, 799 F.2d 254, 260 (6th Cir. 1986), or "had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." *Gephart*, 818 F.2d at 475. The government does not contend that either Byrne or Kus deliberately failed to pay trust fund taxes. However, the district court found that Byrne and Kus were reckless under two different tests, one utilized by the Third Circuit and the other by the Federal Court of Claims. Under the Third Circuit's test, a responsible taxpayer is reckless when he or she: "(1) clearly ought to have

9

known that (2) there was a grave risk that trust fund taxes were not being paid and (3) was in a position to find out for certain very easily." *United States v. Vespe*, 868 F.2d 1328, 1335 (3d Cir. 1989) (quoting *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987)). The test used by the Federal Court of Claims is satisfied when the responsible person: 1) knows (or should know) of a risk that the taxes will not be paid; 2) has a reasonable opportunity to discover and remedy the problem; and 3) fails to undertake reasonable efforts to ensure payment. *Ghandour v. United States*, 36 Fed. Cl. 53, 62 (Fed. Cl. 1996) (citing *Hammon v. United States*, 21 Cl. Ct. 14, 29-30 (1990)).

The district court found that Byrne and Kus acted recklessly because "[they] knew or ought to have known of the risk that [the taxes] were not being paid" since Fuller was untrained in the subject of trust fund taxes and had a previous dispute with the IRS regarding these taxes in 1999. The district court also reasoned that Byrne and Kus had the ability to easily find out whether taxes were being paid as the financial records were kept out in the open and unlocked, but nonetheless failed to actually look at the records or inquire about whether Eagle Trim was current in its tax obligations. However, in finding Byrne and Kus reckless as a matter of law, the district court failed to consider critical facts that would undermine that conclusion. For example, Fuller's 1999 dispute with the IRS was over late payment of taxes, rather than non-payment, and Byrne and Kus were under the impression that there was a bona fide dispute whether the IRS had erred in imposing the penalty. Likewise, Fuller's subsequent tax problem in 2000 involved the payment of trust fund taxes two weeks late, rather than non-payment. Additionally, independent outside auditor WDC issued a clean financial report for Eagle Trim in December 2000 that specifically stated Eagle Trim was current in its tax obligations almost two months before Byrne and Kus became aware about the tax

10

delinquency. Further, Byrne and Kus hired a CFO to supervise Fuller as well as another accountant to assist Fuller, and had WDC provide Fuller with additional training in paying trust fund taxes. Regardless of the test used, these facts show a genuine dispute whether Byrne and Kus should have known that the trust fund taxes were not being paid under these circumstances. Therefore, summary judgment should not have been granted on this basis.

The district court alternatively found that Byrne and Kus acted willfully by choosing to pay other creditors rather than the government upon becoming aware of the tax delinquency. The parties dispute the amount of control that Byrne and Kus had over Eagle Trim's financial affairs under the forbearance agreement. Byrne and Kus argue that after Eagle Trim entered into the lock box arrangement, GMAC controlled all of Eagle Trim's finances. As a result, they did not have the ability to pay the government or any other creditor. During his deposition, Byrne explained how BBK and GMAC refused to disburse payment for payroll taxes:

> No one had—within the scope of Eagle Trim no one had the authority to issue any type of payment for anything. My exact words that I was told, and its going to be a little graphic, when I was told about the taxes, and I believe it was Bernie – I believe it was Andy Jones and myself when I believe it was GMAC and BBK advised us that there was an outstanding issue I requested that the taxes be paid. They said they were not going to do that, and I was trying to make a stink. And I was told that they were using the nonpayment of taxes to hold over Eric's head and bust his balls was the exact statement.

Conversely, the government claims that GMAC advanced funds into Eagle Trim's operating account without restriction and Eagle Trim could have used those funds to pay the government. The government also contends that in February 2001, Eagle Trim had between $900,000 and $3 million or more in accounts receivable due to it, which would have been enough to pay the delinquent tax liabilities.

11

In *Bell*, we were presented with the question:

> whether a debtor's voluntary entrance into a contractual arrangement that restricts the debtor's use of loan advances in a lock-box arrangement encumbers those loan proceeds such that the debtor cannot be said to have failed willfully to meet his or her trust fund obligations because he or she had limited control over the funds.

355 F.3d at 394.

The responsible taxpayer in *Bell* voluntarily entered into a lock box arrangement with Bank One whereby Bank One issued loan advances to the taxpayer. The parties disputed whether Bank One authorized payment only for certain expenses or disbursed funds without restriction. But, it was undisputed that Bank One deposited money in the taxpayer's account which the taxpayer could withdraw at will. Despite these advances, the taxpayer became delinquent in paying trust fund taxes. At some point, the taxpayer requested an additional loan to pay the past due taxes. Bank One refused on the ground that it had already advanced money to cover this expense. Although the taxpayer continued to withdraw money from three separate accounts to pay other creditors, he did not pay the delinquent taxes. The taxpayer argued that his failure to pay trust fund taxes was not willful because the funds had been "encumbered" by Bank One. We held that voluntary contractual obligations, such as the lock box arrangement at issue, did not encumber funds in such a way that would prevent a willfulness finding. *Id.* at 396. Rather, only "certain legal obligations, such as statutes, regulations, and ordinances [which] impede the freedom of a company to use its funds to fulfill its trust fund tax debts" could preclude a finding of willfulness. *Id.*

Relying on *Bell*, the district court found Kus and Byrne willful because they voluntarily entered into the lock box arrangement with GMAC without negotiating the payment of payroll taxes. The court reasoned that Byrne and Kus should have resigned or shut down the company rather than

12

enter into such an arrangement. The court also found that Eagle Trim obtained funds from GMAC to pay for its operating expenses which it could have used to pay the delinquent taxes instead of other creditors.

Yet, unlike *Bell*, there is no evidence that Eagle Trim failed to pay trust fund taxes during the term of the forbearance agreement. And, more importantly, when Eagle Trim entered into the agreement, Byrne and Kus were not aware of Eagle Trim's delinquent tax liability. Therefore, Byrne and Kus would have had no reason to negotiate the payment of past due trust fund taxes prior to entering into the forbearance agreement.

Additionally, in contrast to *Bell*, where the taxpayer arguably received a loan on the condition that certain expenses would be paid but nonetheless could have chosen not to comply and paid the government, it is unclear whether Byrne or Kus ever had a similar opportunity. GMAC vice-president Mark Matheson stated in a declaration that GMAC deposited funds into Eagle Trim's operating accounts but did not control which expenses Eagle Trim paid. However, Pierfelice attested in his affidavit that GMAC and BBK had complete control over the money going in and out of Eagle Trim. According to Pierfelice, BBK would approve an expenditure then arrange for funding of that specific expenditure from GM or GMAC. The money would then be wired to Eagle Trim's accounts and BBK would supervise the disbursement of those funds. Pierefelice attests that because of BBK's supervision it would not have been possible for anyone from Eagle Trim to divert those funds to the government. Based on these competing affidavits, there is a factual dispute about whether Byrne and Kus had any control of the funds received from GMAC and chose to pay other creditors over the IRS

13

or instead lacked control over the funds and the concomitant ability to pay any creditors, including the IRS. Summary judgment was therefore inappropriate.[3]

**IV.**

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the government and remand for further proceedings consistent with this opinion.

---

[3]We also note that because Fuller inflated the receivables, it is not clear from the existing record whether Eagle Trim's receivables would have been sufficient to pay the outstanding tax liability, even if all the outstanding receivables were eventually paid.

14