NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TIMOTHY L. JENKINS,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5019

---

Appeal from the United States Court of Federal Claims in case no. 08-CV-050, Judge Francis M. Allegra.

---

Decided: June 8, 2012

---

TIMOTHY L. JENKINS, of Washington, DC, pro se.

MARION E.M. ERICKSON, Attorney, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, for defendant-appellee. With her on the brief were TAMARA W. ASHFORD, Deputy Assistant Attorney General, and JOAN I. OPPENHEIMER, Attorney.

---

Before NEWMAN, LOURIE, and PROST, *Circuit Judges.*

LOURIE, *Circuit Judge*.

Timothy L. Jenkins appeals from the decision of the United States Court of Federal Claims finding that he was liable for trust fund taxes under 26 U.S.C. § 6672(a). *See Jenkins v. United States*, 101 Fed. Cl. 122 (2011). Because the Court of Federal Claims did not clearly err, we *affirm*.

## BACKGROUND

The central issue in this appeal is whether Jenkins was personally liable for withholding taxes of Dialogue Diaspora, Inc. ("DDI") that DDI failed to pay the Internal Revenue Service ("IRS"). In August, 1992, Jenkins and Gary A. Puckrein entered into a preorganizational memorandum of understanding to govern the creation of DDI to publish a magazine, *American Visions*. Under the agreement, Jenkins and Puckrein would each hold half of the voting stock of the company and would receive equal compensation. The agreement also indicated that Puckrein would be DDI's President and that Jenkins would assume the title of Publisher of *American Visions*.

Shortly after execution of the preorganizational memorandum, DDI became an incorporated entity with Jenkins serving as its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). On August 26, 1992, Puckrein and his wife filed articles of incorporation for DDI with the District of Columbia, and the District accepted the filing approximately one month later. The articles of incorporation listed four directors of the company, specifically, Jenkins, Puckrein, and their respective spouses. One day after the District accepted the articles of incorporation for DDI, the company held its first board meeting. At that meeting, DDI's board resolved that Jenkins was appointed CEO and CFO with the title of Publisher. The meeting minutes also reflect that the

initial distribution of voting stock was 55 percent to Jenkins, 22.5 percent to Puckrein, and 22.5 percent to Puckrein's wife. Subsequent transactions resulted in half of the voting stock being owned by Jenkins and the other half split between Puckrein and his wife.

On the same date that DDI held its first Board of Directors meeting, Jenkins and the other three board members of DDI executed an agreement that provided that DDI would own, publish, and produce *American Visions*. The agreement described Jenkins as "an executive officer and an equity participant" in DDI. *Jenkins*, 101 Fed. Cl. at 125.

After the company was formed with Jenkins as its CEO and CFO, Jenkins provided financing for DDI's operations. First, in addition to leasing their office property to DDI (the "S Street Property"), in early 1993, Jenkins and his wife agreed to encumber the property for the benefit of the company that would print *American Visions*. In addition, Jenkins further agreed to loan capital to DDI for publication and other budgeting costs. For security on the loan, DDI's board of directors created a voting trust that allowed Jenkins to, at his option, exercise control over fifty-five percent of the voting shares of DDI. A second part of the agreement created a factor's lien that secured Jenkins' loan with DDI's merchandise, accounts receivable, and all proceeds from the sale or disposition of the merchandise. Over the operating life of DDI, Jenkins also provided a number of advances to the company to cover operating expenses such as employee salaries. In addition to lending capital to DDI, Jenkins also personally guaranteed some of DDI's debt owed to third-parties.

Beginning in early 1993, DDI filed federal employment tax returns but failed to pay the IRS all of the

withholding taxes due. At this time, Puckrein signed the tax returns filed with the IRS.

Puckrein and Jenkins had a falling out in 1995. In March of that year, Puckrein threatened to sue Jenkins after contending that Jenkins lacked authority to call a DDI board of directors meeting. Puckrein also told Jenkins that "[u]nder the circumstances, our association must come to an end." *Jenkins*, 101 Fed. Cl. at 127. DDI was also increasingly past due on its rental payments to Jenkins for use of the S Street Property. By April, Jenkins learned that DDI had an employment tax dispute with the IRS. After being confronted by Jenkins, Puckrein assured him that the problem had been remedied and that DDI had entered into an installment agreement with the IRS.

In June, 1995, Jenkins learned that DDI was still not compliant with its employment tax payments. At that time, he also learned that Puckrein had been secretly operating a parallel business, American Visions Enterprises. Jenkins and his wife thereafter called a special meeting of DDI's board of directors and invited a local IRS agent to attend the meeting. Jenkins also changed the locks on the S Street Property and posted a sign on the property that stated that the premises had been sealed to preserve evidence for the IRS.

Over Puckrein's protest, DDI's board of directors held a meeting on June 12, 1995. In addition to the board members and their various legal counsel, an IRS agent attended the meeting. At the meeting, a two-thirds majority of DDI's board members replaced Puckrein as DDI's President, removed him from his editor-in-chief position, and appointed an executive committee comprised of Jenkins and his wife.

After the meeting, Jenkins signed an IRS Form 4180. The form reflected that Jenkins, in addition to owning half of DDI's stock, determined DDI's financial policy, had opened corporate bank accounts, signed corporate checks, and guaranteed corporate loans. The form indicated that Jenkins became aware of the delinquent taxes based upon the issuance of DDI's year-end financial statements for 1993 and 1994. Shortly thereafter, Jenkins signed IRS Form 433-B, which listed DDI's income sources and assets.

One month later, on July 5, 1995, Jenkins wrote a check on DDI's bank account payable to himself and his wife for $16,668.47, the balance of DDI's account. At the time he wrote the check, he was aware of DDI's unpaid tax liability to the IRS.

Jenkins thereafter initiated legal action against Puckrein, who filed for bankruptcy in late 1997. In early 1998, over Jenkins protest, the IRS assessed against him a penalty of $189,972 pursuant to § 6672(a) of the Internal Revenue Code for failure to pay the withheld employment taxes. The IRS collected the amounts in 2005 and 2006 by levying on Jenkins' individual retirement account and Social Security benefits. After exhausting his administrative remedies, Jenkins filed a refund claim in the Court of Federal Claims.

Subsequent to holding a trial on Jenkins' claims, the court found that he was under a duty to pay the employment taxes pursuant to § 6672(a). Specifically, the court found that Jenkins held various positions of significant authority within DDI, including the CEO and CFO positions, in addition to being the Publisher of *American Visions*. Moreover, he had the ability to sign checks on DDI's behalf and withdraw DDI's funds. The court also found significant that Jenkins served on DDI's board of

directors and, during the relevant period, owned at least fifty percent of the company's stock. Finally, the court found that by financing the initial operations of DDI, guaranteeing loans to DDI, and leasing the S Street Property to DDI, Jenkins possessed an additional entrepreneurial stake in the company. Thus, even though he did not deal with the company's taxes directly, the court found Jenkins had the power to direct payment of the delinquent taxes.

The court also found that Jenkins' failure to collect, account for, and remit the taxes was willful. Specifically, the court found that Jenkins knew that the payment of employment taxes was at risk at least by April, 1995, and perhaps earlier. The court found that instead of paying the delinquent taxes, Jenkins was primarily interested in recouping the money he invested in DDI, evidenced by his decision to empty DDI's checking account to pay himself $16,668.47 rather than remit that money to the IRS. In addition to that check, the court also found that Jenkins should have known that each check he signed after April 1995, including two additional checks to himself and his wife, was at risk of transferring money that belonged to the United States.

Jenkins timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The scope of our review in an appeal from a Court of Federal Claims decision is limited. We review the lower court's factual findings for clear error. *Columbia Gas Sys., Inc. v. United States*, 70 F.3d 1244, 1246 (Fed. Cir. 1995). A finding is clearly erroneous when, after reviewing the record, we are left with the "definite and firm conviction that a mistake has been committed." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)

(quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). In contrast to our review of factual findings, we review the Claims Court's legal conclusions without deference. *Columbia Gas*, 70 F.3d at 1246.

Every employer is required to deduct and withhold federal income tax and Federal Insurance Contributions Act tax from employees' wages. *See* 26 U.S.C. §§ 3012 and 3402(a). Upon deducting those taxes, the employer holds them in trust for the United States, and the taxes are generally referred to as "trust fund taxes." *Id.* § 7501; *Slodov v. United States*, 436 U.S. 238, 243 (1978).

Section 6672(a) provides a remedy against employers who fail to remit trust fund taxes to the government. In pertinent part, the section provides that "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails" to do so shall be liable for "a penalty equal to the total amount of the tax" that the person failed to pay. For the purposes of the section, a "person" is defined as including "an officer or employee of a corporation" that is "under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671; *Godfrey v. United States*, 748 F.2d 1568, 1573–74 (Fed. Cir. 1984). Thus, the section contains two requirements to impose tax liability: (1) the person must be a "responsible person," i.e., a person under a statutory duty to collect, account for, and pay the trust fund taxes; and (2) that person must have "willfully" failed to perform the statutory duty. *Id.* at 1574.

On appeal, Jenkins raises a number of arguments regarding both requirements. First, Jenkins argues that despite his CEO and CFO titles, he was not a responsible person at DDI because his employment duties were to develop, promote and supervise a campaign of volunteers for *American Voices*, not tax collection or payroll. Jenkins

argues that because of Puckrein's conduct, he never truly owned stock in DDI, his position on DDI's board of directors was contested and without effect, and he was unable to manage daily operations. Jenkins asserts that he was unable to make decisions regarding the priority payment of taxes and debts and ultimately was only a DDI creditor. Thus, he argues, it was clearly erroneous to find that he was a responsible person under § 6672(a).

We disagree. While Jenkins argues that DDI was effectively Puckrein's sole proprietorship, the undisputed corporate records show that Jenkins was DDI's CEO and CFO, controlled at least half of the company's stock, and was one of four board members. In addition, he was the Publisher of *American Voices*, the primary business of DDI. It was not clearly erroneous to find that those positions were not illusory and that Jenkins had the authority to demand that DDI pay its trust fund taxes. Indeed, the record below contains evidence that Jenkins determined the company's financial policy, convened board meetings, issued checks in DDI's name, and directed DDI's bank not to honor certain checks. Moreover, he was also DDI's landlord, guarantor of its debt, and financier. Thus, the court did not clearly err when it found that Jenkins was a responsible person under a duty to collect, account for, and pay the trust fund taxes.

Regarding the court's finding that Jenkins acted willfully, Jenkins raises three main arguments. First, Jenkins argues that because the $16,668.47 of DDI funds that he paid himself was subject to a lien in his favor, he did not willfully pay other creditors instead of paying the government. Second, Jenkins argues that the record below demonstrates that, at most, he acted negligently regarding the trust fund taxes, not willfully. According to Jenkins, the vast majority of the checks he signed on DDI's behalf were dated well before he learned that DDI

had tax liabilities.  Finally, Jenkins argues that, even if his appropriating the \$16,668.47 to himself was a willful act, he is only liable for that amount, not the full tax liability assessed by the IRS.

We disagree.  In addition to encompassing a deliberate choice to pay other creditors instead of paying the trust fund taxes to the government, "[w]illful conduct may also include a reckless disregard of an 'obvious and known risk' that taxes might not be remitted." *Godfrey*, 748 F.2d at 1577 (quoting *Feist v. United States*, 607 F.2d 954, 961 (Ct. Cl. 1979)).  Jenkins testified at trial that he became aware in April, 1995 that DDI was delinquent on its trust fund tax payments, although the record contains documentary evidence that Jenkins may have been aware of the issue in 1994.  While Puckrein assured Jenkins that he had remedied the tax issue, Jenkins' own recollection of events shows that such a reliance on Puckrein was unwise at best and it was not clear error to find that Jenkins recklessly disregarded a known risk that the taxes might not be remitted.  Indeed, "[o]nce a 'responsible person' has had clear notice that the person to whom he has delegated responsibility for paying the taxes has wrongfully failed to pay them in the past, he continues to delegate that responsibility only at his peril." *Thomsen v. United States*, 887 F.2d 12, 19 (1st Cir. 1989).  In addition, the record also contains evidence that after learning that DDI may have been deficient in paying the trust fund taxes, Jenkins signed 13 checks on DDI accounts that were payable to creditors other than the United States.  While Jenkins focuses on the \$16,668.47 check he issued to himself, arguing that those funds were subject to a lien, Jenkins fails to explain the distribution of the other funds.  And, in any event, the tax code establishes that the withheld taxes are held by the employer in "trust for the United States."  26 U.S.C. § 7501.  Finally, in toto,

the record contains sufficient evidence that Jenkins' willful conduct was not solely limited to his appropriating $16,668.47 from DDI, and, regardless, Jenkins fails to provide any authority that a responsible person's liability is limited to the specific dollar amounts in which the person chose to benefit someone other than the United States.

Ultimately, while we commend Jenkins for attempting to involve the IRS upon learning that DDI was not paying the withheld taxes, we cannot hold on this record that the Court of Federal Claims clearly erred in finding Jenkins liable for the trust fund taxes. We have considered Jenkins' remaining arguments and conclude that they are without merit. For the foregoing reasons, the judgment of the Court of Federal Claims is

**AFFIRMED**