RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0104p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

ROGER BYRNE,

*Plaintiff-Appellant*,

*v.*

No. 15-2396

UNITED STATES OF AMERICA,

*Defendant-Appellee*,

ERIC C. KUS,

*Counterclaim Defendant-Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:06-cv-12179—Arthur J. Tarnow, District Judge.

Argued:  December 8, 2016

Decided and Filed:  May 15, 2017

Before:  BATCHELDER, STRANCH, and DONALD, Circuit Judges.

---

**COUNSEL**

**ARGUED:**  Randolph T. Barker, BERRY MOORMAN P.C., Detroit, Michigan for Appellant Byrne.  Scott R. Murphy, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Appellant Kus.  Ivan C. Dale, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Randolph T. Barker, BERRY MOORMAN P.C., Detroit, Michigan, Scott R. Murphy, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Appellants.  Ivan C. Dale, Jonathan S. Cohen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  The Internal Revenue Code, 26 U.S.C. § 6672, permits the United States to recover unpaid trust-fund taxes[1] from persons responsible for paying those taxes, if they willfully failed to pay them.  We have previously held that Appellants Roger Byrne and Eric Kus, as president and CEO, respectively, of Eagle Trim, Inc. ("Eagle Trim") were responsible for paying Eagle Trim's trust-fund taxes, but we remanded on the question of whether their failure to pay those taxes was willful.  On remand, the district court conducted a bench trial and determined that Byrne and Kus willfully failed to pay Eagle Trim's trust-fund taxes by recklessly disregarding the risk that the taxes were not being paid.  Byrne and Kus appeal the entry of judgment, which assigned Byrne a liability of $533,213.42 and Kus a liability of $533,204.37.

After a review of the record and a clarification of what constitutes reckless conduct for purposes of § 6672(a), we conclude that Byrne and Kus did not willfully fail to pay Eagle Trim's trust-fund taxes.  Accordingly, we vacate the district court's judgment and remand for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

In 1998, Eagle Picher Corporation, a large manufacturing concern, owned a division that produced interior-trim parts for automobiles.  The trim division's factory was located in Kalkaska, Michigan, where hundreds of employees worked in manufacturing and in administration.  Eagle Picher's trim division also had a sales office in the Detroit area, 250 miles to the southeast of Kalkaska.  Eagle Picher put its trim division up for sale in 1998.

---

[1]"A trust[-]fund tax is money withheld from an employee's wages (income tax, social security, and Medicare taxes) by an employer and held in trust until paid to the Treasury."  Internal Revenue Service, *Trust Fund Taxes*, https://www.irs.gov/businesses/small-businesses-self-employed/trust-fund-taxes (last visited March 15, 2017).  The record in this case contains references to "payroll taxes," which can be used interchangeably with "withholding taxes" and "trust-fund taxes."  Because the latter is used by the IRS, we have chosen to refer to "payroll taxes" as "trust-fund taxes" throughout this opinion.

Eric Kus and Gary Anderson assembled a small group of investors, including Roger Byrne and Bernard Fuller, to buy Eagle Picher's trim division. They negotiated a $15 million purchase price with Eagle Picher and a financing package with General Motors Acceptance Corporation Business Credit LLC ("GMAC"), closing the deal on October 31, 1998. The investors created Eagle Trim to operate the new venture, and Eagle Land Holdings, LLC as a holding company for the real estate. Kus became the chairman and chief executive officer of Eagle Trim upon its formation. Byrne served as the president of Eagle Trim, and Fuller became the controller.

Part of the financing package was a revolving line of credit provided by GMAC to Eagle Trim, the maximum amount of which was calculated based on the company's current accounts receivable and inventory, secured by a lien on all of Eagle Trim's assets. Eagle Trim borrowed money against the line of credit to pay operating expenses, including trust-fund taxes. The financing agreement gave GMAC the right to have an accounting firm of its choice examine Eagle Trim's business records on a periodic basis, and GMAC exercised this right. GMAC used different firms to conduct these examinations, called "collateral reviews," including Lender Services and Iannuzzi & Darling, LLC. The findings of the collateral reviews were provided directly to GMAC, but they were not routinely shared with Eagle Trim.[2]

The GMAC financing agreement also required Eagle Trim to provide GMAC with annual financial statements audited by an independent accounting firm. Eagle Trim hired the Michigan certified public accounting ("CPA") firm of Weber, Curtin & Drake, PC ("WCD") to conduct these year-end audits and to prepare Eagle Trim's corporate income tax returns. In an engagement letter describing the scope of its services, WCD stated that its audits would be designed "to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements." The letter cautioned, however, that an audit, even performed in accordance with generally accepted auditing principles ("GAAP"), "is not a guarantee of the

---

[2]It remains unclear, however, to what extent Byrne and Kus were able to discuss these collateral reviews with GMAC or GMAC's auditors. Kus testified that he spoke with GMAC auditors regarding a June 2000 collateral review that revealed a potential tax delinquency for April and May 2000. The government implies that Byrne and Kus also knew the content of one of GMAC's collateral reviews from October 2000, which revealed a potential tax delinquency for the third quarter of 2000, but there is no evidence that Bryne or Kus had knowledge of this report.

accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected."

Although Byrne and Kus were responsible for Eagle Trim's income tax returns, Fuller, as controller, had wide discretion over Eagle Trim's financial activities, and the responsibility to ensure that Eagle Trim's tax liabilities—including both trust-fund tax deposits and returns—remained current. In January 1999, WCD provided Fuller with the forms he needed to comply with the relevant tax laws and also provided guidance on how to prepare and file trust-fund taxes. Despite this guidance, Fuller deposited trust-fund taxes with the IRS on a biweekly, as opposed to a semiweekly, basis. *See* 26 C.F.R. § 31.6302-1(b). This resulted in a large penalty assessment against Eagle Trim in early 1999. By the end of 1999, Kus and Byrne had decided that Fuller was not adequately performing his duties, and Kus provided Fuller a handwritten list of tasks that he needed to start completing accurately and timely.

In March 2000, GMAC's auditor, Lender Services, sent a letter to GMAC, stating that Eagle Trim had provided inadequate supporting documentation for Lender Services' collateral reviews. Lender Services therefore recommended, among other things, that Eagle Trim implement procedures to "[e]nsure all tax payments are made timely[] with supporting detail retained." GMAC forwarded this letter to Eagle Trim, and Kus reviewed it. Within two weeks, Fuller sent a letter to GMAC, responding to Lender Services' letter. Fuller acknowledged that he missed two trust-fund tax deposits during Eagle Trim's switch from Northwestern Bank to National City Bank, but he asserted that Eagle Trim was then current with all tax deposits. Fuller copied Kus and Byrne on this correspondence.

Also in March 2000, WCD sent a letter to Kus, copying Byrne and Fuller, advising Eagle Trim of deficits in its accounting practices, which WCD had observed while conducting its 1999 audit. The letter also stated, however, that WCD's observations did not discover any "material weaknesses," defined as conditions which Eagle Trim's internal control structure failed to "reduce to a relatively low level the risk that errors or fraud in amounts that would be material in relation to the financial statements being audited may occur." WCD recommended in its letter that Eagle Trim hire an assistant controller with an accounting degree.

Pursuant to WCD's recommendation, in April 2000,[3] Eagle Trim hired Kelly Gillman, an accountant, to assist Fuller with his duties as controller. Perhaps due in part to Fuller's continued mishandling of Eagle Trim's finances,[4] in July 2000, Eagle Trim also hired Andrew Jones as Eagle Trim's chief financial officer. As CFO, Jones reported to both Byrne and Kus on all of the financial aspects of Eagle Trim. Fuller reported to Jones, providing monthly financial statements for Jones to review.

In October 2000, the IRS sent Eagle Trim a notice of a penalty for $98,622.32 for unpaid trust-fund taxes for the first quarter of 2000. David Drake, a WCD partner, met with Fuller to discuss the penalty. Fuller informed Drake that he had failed to pay the trust-fund taxes on time because of difficulties associated with Eagle Trim's switch from Northwestern Savings Bank to National City Bank. He said that he had contacted the IRS several times about the issue and that an IRS representative had informed him that Eagle Trim had made all trust-fund tax deposits in full and on time since June 14, 2000. Following his conversation with Fuller, Drake sent a letter to the IRS, repeating Fuller's explanation for the late trust-fund tax deposit and requesting that the IRS waive the penalties. Drake also attached an Eagle Trim check to the letter to pay the interest on the late trust-fund taxes. On November 10, 2000, Fuller sent a letter to Kus, Byrne, and Jones, describing the IRS penalty, his meeting with Drake, and Drake's request for an abatement of the penalty.

WCD issued a "clean" audit on December 11, 2000, regarding Eagle Trim's financial statements through September 30, 2000, opining that the financial statements presented Eagle Trim's financial position fairly in all material respects. The report found that Eagle Trim was current in the payment of trust-fund taxes. Despite WCD's clean audit report, in January 2001, WCD sent a letter to Kus, copying Byrne, Jones, and Fuller, identifying flaws in Eagle Trim's accounting practices observed by WCD in the course of its 2000 audit. The letter included a section devoted to Eagle Trim's failure to pay trust-fund taxes in a timely manner, recounting the

---

[3]There is some dispute in the record as to when Gillman was hired. Our previous opinion provided that Gillman was hired in January 2000, but Byrne testified at trial that she was hired in April 2000. We have given more weight to the testimony provided at trial.

[4]There were indications throughout 2000 that Fuller was inadequate for his position. Hundreds of Eagle Trim's checks bounced in 2000, and Fuller had fallen behind on paying employees' health insurance premiums.

IRS penalties assessed for unpaid trust-fund taxes in 1999 and the first quarter of 2000. The letter added that WCD had been informed by "management" that trust-fund taxes for the second quarter of 2000 had been untimely as well, though the IRS had not yet assessed a penalty. WCD recommended that Eagle Trim "take the measures necessary to ensure that all payroll taxes and withholdings are deposited in a timely manner" and offered to assist Eagle Trim should "any payroll tax questions arise." WCD stated, however, that its observations did not discover any "material weaknesses" in Eagle Trim's internal control structure.

Also in January 2001, Lender Services discovered that Eagle Trim's financial statements were fraudulently overstated and the company, rather than being profitable, was losing money. According to GMAC's review, Fuller had falsified certain receivables by adding digits to the invoice. For example, an $8,000 invoice was recorded as an $80,000 receivable. Eagle Trim entered into a Forbearance Agreement with GMAC, dated January 31, 2001, and an Access and Accommodation Agreement with GM, dated February 2, 2001. Under the terms of these agreements, GM hired a crisis management company, BBK, Ltd. ("BBK"). At the time the Forbearance and Accommodation Agreements were executed, Kus and Byrne were unaware that Eagle Trim was delinquent on trust-fund taxes for the second, third, and fourth quarters of 2000. After execution of the agreements, both GMAC and BBK reviewed and approved all funding for Eagle Trim and had complete control over the flow of money in and out of Eagle Trim.

In late February 2001, BBK informed Byrne and Kus that Eagle Trim was delinquent on its trust-fund tax deposits for the last three quarters of 2000. Fuller and Byrne asked BBK for permission to pay these delinquent taxes, but the BBK reviewers refused to approve this expenditure. Fuller was then fired.

On March 1, 2001, WCD sent a letter to Byrne, copying Kus. The letter explained that due to the discovery of "intentional, improper accounting" resulting in material misstatements, Eagle Trim should no longer rely on WCD's audit reports for 1999 and 2000. The same day, Drake sent a letter to Byrne explaining that WCD was recalling its audit reports due to the discovery that Fuller had been making "a series of incorrect, inaccurate and/or fictitious entries, primarily relating to tooling receivables, pre-paid tooling and accounts payable." Drake wrote

that "there was a significant effort on the part of Mr. Fuller to disguise these activities, and to prevent their discovery in the course of our audits . . . ."

In April 2001, Byrne signed a Chapter 11 bankruptcy petition on behalf of Eagle Trim in the Eastern District of Michigan. Eagle Trim ultimately liquidated through this bankruptcy proceeding, which eventually yielded payments to the IRS for the unpaid trust-fund taxes for the second quarter of 2000.

In July 2005, the IRS assessed against Byrne and Kus $855,668.35 in penalties under § 6672 for Eagle Trim's outstanding trust-fund tax liability for the year 2000. Byrne paid $1,000 to the IRS and then filed a claim for a refund of the $1,000 and an abatement of the penalty as well as an abatement of the entire assessment. The IRS denied this claim, after which Byrne filed the instant lawsuit in the United States District Court for the Eastern District of Michigan. The government filed an Answer and Counterclaim, which included a third-party claim against Kus, seeking a judgment for the assessment balance. Kus then filed an Answer and Counterclaim to the government's third-party claim against himself. All other claims initially brought in the litigation were resolved prior to the first entry of summary judgment in favor of the government. Byrne and Kus appealed, arguing that they were not persons responsible for paying Eagle Trim's trust-fund taxes, and alternatively, if they were responsible, they did not willfully fail to pay the trust-fund taxes. In *Byrne v. United States*, 498 F. App'x 555, 560 (6th Cir. 2012) ("*Byrne I*"), a panel of this court held that, by virtue of their roles and responsibilities within Eagle Trim, Byrne and Kus were responsible persons under § 6672. But we found that "the district court failed to consider critical facts that would undermine" the conclusion that Byrne and Kus willfully failed to pay Eagle Trim's trust-fund taxes. *Id.* at 561. Because the record contained facts that showed a genuine dispute as to whether Byrne and Kus should have known that Eagle Trim's trust-fund taxes were not being paid, we reversed the district court's grant of summary judgment and remanded for further proceedings. *Id.* at 562, 563.

On remand, Byrne and Kus filed a renewed motion for summary judgment, which the district court denied. After a three-day bench trial, the district court issued its findings of fact and conclusions of law, finding that Byrne and Kus willfully failed to pay Eagle Trim's trust-fund taxes for the third and fourth quarters of 2000 and were therefore liable under § 6672. The

district court entered judgment against Kus in the amount of $533,204.37, and against Byrne in the amount of $533,213.42.[5] This timely appeal followed.

## II.  STANDARD OF REVIEW

We review the district court's findings of fact for clear error and its conclusions of law de novo in an appeal from a judgment entered after a bench trial. *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012); Fed. R. Civ. P. 52(a)(6).  We also review de novo "ultimate facts" and mixed questions of law and fact. *Id.*; *see also Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc) ("Lower court findings of ultimate facts based upon the application of legal principles to subsidiary facts are subject to *de novo* review.").

The parties vigorously disagree as to which standard of review applies in the instant case. Appellants claim that the determination of liability under 26 U.S.C. § 6672 presents a mixed question of law and fact, while Appellee argues that the determination of willfulness under § 6672(a) is a question of fact.  Which standard of review applies to the district court's determination that a responsible person willfully failed to pay trust-fund taxes is a question of first impression in this court.  While we acknowledge that at least one of our sister circuits has held that the determination of willfulness under § 6672(a) is a question of fact, see *Wright v. United States*, 809 F.2d 425, 428 (7th Cir. 1987), we believe that, at least in this context, willfulness is a question of ultimate fact because finding that someone was willful requires the application of a legal standard to underlying facts.  Byrne and Kus do not challenge the district court's factual findings regarding their conduct; they challenge whether this conduct satisfies the legal standard of willfulness. We therefore review de novo the district court's holding that Byrne and Kus willfully failed to pay Eagle Trim's trust-fund taxes. *See Williams*, 186 F.3d at 689.

## III. LEGAL STANDARD

The Internal Revenue Code requires employers to withhold income and FICA (Social Security and Medicare) taxes from their employees' wages and to deposit the withheld amounts with the United States Treasury on either a monthly or semiweekly basis, depending on the amount of tax due.  *See* 26 U.S.C. §§ 3102(a), 3402(a); 26 C.F.R. §§ 31.3102-1, 31.6011(a)-1,

---

[5]The record does not indicate why there is a slight difference in the judgment amounts.

31.6011(a)-4; Internal Revenue Service, Publication 15 (Circular E), Employer's Tax Guide (2017).  Employers are required to hold these monies in a special fund in trust for the United States, until such time as the employer is required to remit payment to the Treasury.  26 U.S.C. § 7501(a).  "The withholding taxes are part of the wages of the employee, held by the employer in trust for the government; the employer, as a function of administrative convenience, extracts money from a worker's paycheck and briefly holds that money before forwarding it to the IRS." *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004) (quoting *Gephart v. United States*, 818 F.2d 469, 472 (6th Cir. 1987)) (internal quotation marks omitted).  "An employer who fails to pay taxes withheld from its employees' wages is, of course, liable for the taxes which should have been paid." *Slodov v. United States*, 436 U.S. 238, 243 (1978) (citing 26 U.S.C. §§ 3102(b) and 3403).  The IRS may impose penalties against delinquent employers, see for example 26 U.S.C. §§ 6656, 7202, 7215, and may hold certain employers personally liable, as in this case, 26 U.S.C. § 6672(a).

Under § 6672(a):

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. . . .

"Person" is defined in § 6671(b) as "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." *See also Slodov*, 436 U.S. at 245.

"[A]n individual is liable under § 6672(a) if he or she: 1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government." *Bell*, 355 F.3d at 393 (citations omitted); *see also Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir. 1993).  The taxpayer bears the burden of proving by a preponderance of the evidence either that he is not a responsible person or that his failure to pay taxes was not willful. *Cline v. United States*, 997 F.2d 191, 194 (6th Cir. 1993); *McDermitt v. United States*, 954 F.2d 1245, 1251 (6th Cir. 1992) (collecting cases).  This is a conjunctive test; that is, "[a]ttaining the status of a 'responsible

person' does not . . . encompass strict liability for a company's tax delinquency." *Michaud v. United States*, 40 Fed. Cl. 1, 23 (1997); *see also Byrne I*, 498 F. App'x at 560–61 (explaining that taxpayers are not liable under § 6672(a) unless their failure to pay trust-fund taxes was willful).

A responsible person will be found liable under § 6672(a) if the government can demonstrate that he had either (1) actual knowledge that the trust-fund taxes were not paid and the ability to pay the taxes, or (2) recklessly disregarded known risks that the trust-fund taxes were not paid. In other words, for a responsible person to be deemed to have acted willfully under § 6672(a), he must have either "had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government," *Gephart*, 818 F.2d at 475 (citation omitted), or "deliberately or recklessly disregarded facts and known risks that the taxes were not being paid," *Calderone v. United States*, 799 F.2d 254, 260 (6th Cir. 1986). In describing actual knowledge, we have held:

> A responsible person who first becomes aware of a past due withholding tax liability after the liability has accrued is considered willful (for purposes of section 6672) if he fails to use all unencumbered funds that come into his possession thereafter to pay the delinquent taxes. Funds are considered encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and [the] legal obligation is superior to the interest of the IRS in the funds.

*Huizinga v. United States*, 68 F.3d 139, 145 (6th Cir. 1995) (quoting *Honey v. United States*, 963 F.2d 1083, 1090 (8th Cir. 1992)) (internal quotation marks omitted).

"But willful conduct may also include a reckless disregard for obvious or known risks." *Calderone*, 799 F.2d at 259–60 (citation and internal quotation marks omitted). Some of our sister circuits have indicated that gross negligence may satisfy § 6672(a)'s willfulness prong, see *Phillips v. IRS*, 73 F.3d 939, 943 (9th Cir. 1996), *Wright*, 809 F.2d at 427, but we have never held that negligence, even gross negligence, is enough to support a finding of willfulness. *Cf. Calderone*, 799 F.2d at 259–60 ("More than mere negligence is required for willfulness."). Namely, "a person is not willful if as a result of negligence he is unaware of the default in the payment of payroll taxes." *Id.* (citation and internal quotation marks omitted). What constitutes reckless disregard for purposes of § 6672(a) is an issue of first impression for this court.

However, several of our sister circuits have enunciated tests for recklessness under § 6672(a), a brief overview of which lays the groundwork for our analysis.

In many circuits, "[r]eckless disregard includes failure to investigate or correct mismanagement after being notified that withholding taxes have not been paid." *Morgan v. United States*, 937 F.2d 281, 286 (5th Cir. 1991) (per curiam); *see also Greenberg v. United States*, 46 F.3d 239, 244 (3rd Cir. 1994); *Denbo v. United States*, 988 F.2d 1029, 1033 (10th Cir. 1993); *Godfrey v. United States*, 748 F.2d 1568, 1577 (Fed. Cir. 1984). The Second Circuit also defines willful conduct as "includ[ing] a reckless disregard for obvious and known risks as well as a failure to investigate . . . after having notice that withholding taxes have not been remitted to the Government." *Winter v. United States*, 196 F.3d 339, 345 (2d Cir. 1999) (citation and internal quotation marks omitted). But the Second Circuit recognizes an exception to § 6672(a) liability when a responsible person "believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *Id.* (citation and internal quotation marks omitted). The Fifth Circuit has also held that taxpayers who act with reasonable cause may be able to defeat a finding of willfulness. *See Conway v. United States*, 647 F.3d 228, 234, 235 (5th Cir. 2011) (finding that reasonable reliance on the advice of counsel may constitute reasonable cause under some circumstances).

The First Circuit explains that "an individual who acts with a 'reckless disregard' of a known or obvious risk of nonpayment acts willfully." *Vinick v. CIR*, 110 F.3d 168, 173 (1st Cir. 1997) (citation omitted). The First Circuit has recognized three factual scenarios that meet this standard:

> (1) [R]eliance upon the statements of a person in control of the finances when the circumstances show that the responsible person knew the person to be unreliable; (2) failure to investigate or to correct mismanagement after having notice of nonpayment of withholding taxes; and (3) knowing that the business is in financial trouble and continuing to pay other creditors without making reasonable inquiry as to the status of the withholding taxes.

*Id.* And the Seventh Circuit has held that a responsible person is willful under § 6672 "if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not

being paid and if (3) he was in a position to find out for certain very easily." *Wright*, 809 F.2d at 427.

Having reviewed the precedents of our sister circuits, we reiterate our previous holding that a responsible person is reckless and therefore willful under § 6672(a) when he disregards obvious or known risks that trust-fund taxes are not being paid to the Treasury and fails to investigate. *See Calderone*, 799 F.2d at 259–60. However, we must balance the government's prerogative to recover that which is owed with limiting liability for that recovery to those who are personally at fault. *See Collins v. United States*, 848 F.2d 740, 741–42 (6th Cir. 1988). For this reason we now adopt the Second Circuit's "reasonable cause" exception to § 6672(a) liability, such that "a responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *Winter*, 196 F.3d at 345 (citations and alteration omitted). That is, if a responsible person can demonstrate by a preponderance of the evidence that he reasonably believed that trust-fund taxes were being paid, he will not be liable under § 6672(a).[6] This narrow exception will not permit responsible corporate officers to evade liability simply because they compartmentalized responsibilities and adopted a "hear-no-evil-see-no-evil" policy. Rather, this exception limits liability to those who, under the circumstances, failed to take reasonable steps to ensure payment of trust-fund taxes after having received notice that those taxes were not being paid.

## IV. DISCUSSION

Under this rubric, the district court correctly determined that Byrne and Kus did not have actual knowledge that the trust-fund taxes were not being paid. The record clearly indicates that Byrne and Kus did not acquire actual knowledge of the delinquency until after the Forbearance Agreement was executed and GMAC and BBK assumed control of Eagle Trim's finances. *Cf. Bell*, 355 F.3d at 393–94. However, the district court incorrectly determined that Byrne and

---

[6]It is true that "section 6672(a) does not have a reasonable cause exception," *Brewery v. United States*, 33 F.3d 589, 593 (6th Cir. 1994), but to hold a responsible person liable when he or she reasonably believed taxes were being paid would be to engulf conduct that Congress, in requiring "willfulness," never intended to be covered by the law. *See Slodov*, 436 U.S. at 254 ("The fact that the provision imposes a 'penalty' and is violated only by a 'willful failure' is itself strong evidence that it was not intended to impose liability without personal fault.").

Kus recklessly disregarded the risk that Eagle Trim's trust-fund taxes were not being paid in the third and fourth quarters of 2000.  We agree with the district court that the facts of this case make the issue of recklessness a "close call," but, for the reasons stated below, we disagree with the district court that Byrne and Kus acted unreasonably.

## A.  Reckless Disregard

Here, the district court found that Byrne and Kus exhibited recklessness by relying on Fuller to pay the trust-fund taxes and by failing to verify the timely payment of the taxes.  The record supports the district court's determination that Byrne and Kus were aware that Fuller had failed to timely pay trust-fund taxes in 1999 and early 2000 and that Fuller was unreliable in ensuring the proper and timely payment of trust-fund taxes.  But the district court found that Byrne and Kus's reliance on WCD's clean audit reports could not mitigate their liability under § 6672(a) because, among other things, WCD never verified Fuller's account of why he did not deposit the trust-fund taxes on time in 1999 and early 2000.  Rather, according to the district court, Byrne and Kus should have personally verified that Fuller was actually making the tax deposits on time.  The district court added that Byrne and Kus's duty to personally verify Eagle Trim's tax compliance was made even clearer in January 2001, when WCD wrote a letter to Eagle Trim's management and failed to include "any explanation from Fuller for the untimely deposits of the second quarter of 2000, let alone report that it had investigated Fuller's explanations."  The district court stated that WCD's January 2001 letter[7] "highlighted the risk of continued untimely payments[,] . . . indicating that Fuller's reliability was still in question and that WCD had not examined it in any comprehensive manner."  "In this context," the district court held, "the information from WCD was no cure for Byrne and Kus's recklessness in relying on Fuller to fulfill duties he had fulfilled so unreliably in the past."

---

[7]In its opinion, the district court identifies this letter as dating from January 2000.  (R. 99 at 2676.) This appears to be a typographical error; a letter to this effect from WCD dating from January 2000 does not appear to have been introduced into the record.

We agree with the district court that Byrne and Kus knew or should have known there was a substantial risk that Eagle Trim's trust-fund taxes were not being paid.[8] The fact that in 1999 Fuller was paying Eagle Trim's trust-fund taxes biweekly instead of semiweekly as required by IRS regulations may not, in itself, have been enough to hold Byrne and Kus liable under § 6672(a). Just because Fuller was not competently performing his job duties does not mean that Byrne and Kus would have had reason to know that the trust-fund taxes were not being paid. It could very well have been the case that Fuller was failing to adequately oversee and execute Eagle Trim's other financial obligations (*e.g.*, health insurance premium payments and state payroll taxes), while also paying Eagle Trim's trust-fund taxes on time. A responsible person's knowledge of general mismanagement concerns cannot be the sole basis for determining that he or she knew or had reason to know that *trust-fund taxes* were not being paid. But Byrne and Kus continued to receive information indicating Fuller's irresponsibility in paying the trust-fund taxes or in his accounting practices. Fuller notified Byrne and Kus that he had missed two trust-fund tax deposits in early 2000 during Eagle Trim's switch from Northwestern Bank to National City Bank. And in March of 2000, WCD notified Byrne and Kus that Eagle Trim was deficient in its accounting practices, even if WCD had not observed any "material weaknesses" in Eagle Trim's financial statements.

We also agree with the district court that Byrne and Kus had a reasonable opportunity to investigate the status of Eagle Trim's trust-fund taxes. Kus, as chairman and CEO, was responsible for Eagle Trim's business strategy, acquisitions, sales, marketing, contact with major customers, development of new products, and extension of product lines. As president, Byrne's

---

[8]Byrne and Kus argue that Fuller's prior failures to pay trust-fund taxes in a timely fashion are not sufficient to give rise to notice that Eagle Trim's trust-fund taxes were not paid for the third and fourth quarters of 2000. (Appellants' Br. at 35.) They cite Federal Circuit case law that ostensibly supports their argument. In *Godfrey v. United States*, 748 F.2d 1568, 1578 (Fed. Cir. 1984), the Federal Circuit stated that "actual notice of the *current delinquency* [is necessary] to establish an affirmative duty to act." Similarly, the Court of Federal Claims has held that "[w]illfulness can only be met if the responsible individual had actual knowledge of the specific tax delinquency for which the penalty was assessed." *Ghandour v. United States*, 36 Fed. Cl. 53, 62 (1996). Neither of these cases persuades us. While the *Godfrey* court's statement regarding actual notice of the current delinquency may be persuasive authority, it is ultimately unhelpful because the Federal Circuit held that Godfrey was not a responsible person under § 6671(b). 748 F.2d at 1578–79. A careful reading of *Godfrey* reveals that the above-quoted statement is read most naturally as referring to the "actual knowledge" prong of § 6672(a)'s willfulness requirement. *Ghandour* supports our reading of *Godfrey*, as the quoted statement upon which Byrne and Kus rely is excerpted from the *Ghandour* court's discussion of the "deliberate choice" (or "actual knowledge") prong of the willfulness requirement. 36 Fed. Cl. at 62.

responsibilities included handling Eagle Trim's day-to-day operations, manufacturing oversight, and engineering development. Subject to Kus's approval, Byrne determined employees' salaries and discretionary bonuses. Byrne reported to Kus and Anderson; everyone else at Eagle Trim—approximately 400 employees—reported to Byrne. Both Byrne and Kus had the ability to hire and fire employees, and they both had signature authority on all Eagle Trim bank accounts and the borrowing base certificates that Eagle Trim submitted to GMAC. Until Jones was hired as CFO, Fuller reported directly to both Byrne and Kus. Even after Jones was hired, Fuller indirectly—through Jones—reported to Byrne and Kus. Byrne and Kus had the business experience and knowledge to understand the basic tax requirements of the Internal Revenue Code, as the record shows that they both had degrees in business and accounting. They both were able, and indeed were required under Eagle Trim's financing agreement with GMAC, to hire an independent auditing firm to review Eagle Trim's financial statements and prepare Eagle Trim's income tax returns. With their educational and professional backgrounds, their ability to hire support staff or further oversee Fuller's work, and their capacity to hire an outside accounting firm to audit Eagle Trim's financial records, Byrne and Kus had a reasonable opportunity to discover and remedy the nonpayment of trust-fund taxes.

## B. Reasonable-Cause Exception

While the district court did not have the benefit of our adopting a reasonable-cause exception to § 6672(a), the district court's finding that Byrne and Kus were reckless largely turned on the reasonableness of their reliance on WCD's guidance and audits. Under the circumstances—as muddled as they are—we disagree with the district court that Byrne and Kus did not demonstrate by a preponderance of the evidence that they reasonably believed that Eagle Trim's trust-fund taxes for the third and fourth quarters of 2000 were being paid.

The district court held that "Byrne and Kus could not rely on WCD to verify that Fuller had become a responsible taxpayer without making any inquiry into what WCD actually did to review his performance of his payroll tax duties." In support of its conclusion, the district court cited Drake's deposition testimony that when he drafted a letter to the IRS concerning the penalty for the first quarter of 2000, he had done nothing to verify Fuller's account of the late payments. The district court also cited WCD's January 2001 letter to Eagle Trim's management,

in which WCD recommended, based on the audit it had performed for the 2000 fiscal year, that Eagle Trim "take the measures necessary to ensure that all payroll taxes and withholdings are deposited in a timely manner." "WCD's letter highlighted the risk of continued untimely payments and offered no concrete suggestions for averting that risk," which should have, according to the district court, "indicat[ed] that Fuller's reliability was still in question and that WCD had not examined it in any comprehensive manner." The district court's latter justification is insufficient to demonstrate that with regard to payment of the trust-fund taxes for the two financial quarters in question Byrne and Kus were reckless in relying on the WCD January 2001 letter, because that letter was drafted *after* payment of those trust-fund taxes.

With respect to the district court's former justification, it is certainly true that Byrne and Kus could have taken any number of additional steps to ascertain the status of Eagle Trim's trust-fund tax liability. However, our inquiry is limited to whether their belief that trust-fund taxes were being timely paid was reasonable under the circumstances. We will not impose liability on Byrne and Kus simply because they did not independently verify their auditors' reports or Fuller's account of the status of Eagle Trim's tax position. Rather, under the circumstances and for the following reasons, we hold that Byrne and Kus took reasonable steps to ensure the timely payment of trust-fund taxes and reasonably believed that the taxes were being paid.

First, in April 2000, Byrne and Kus hired Kelly Gillman, an accountant, to assist Fuller in performing his duties. Gillman was not responsible for the trust-fund taxes, but she was hired to assist Fuller in performing his duties, including payment of Eagle Trim's trust-fund taxes. Byrne and Kus also added Andrew Jones as Eagle Trim's CFO in July 2000. In this position, Jones oversaw Fuller's work and reported to Byrne and Kus. While we do not hold that responsible persons may escape liability under § 6672(a) simply because they have hired support staff or other officers to review payment of trust-fund taxes, these are important considerations in determining whether Byrne and Kus reasonably believed Eagle Trim was making timely payment of trust-fund taxes.

Second, Byrne and Kus's hiring of WCD—an independent, professional accounting firm—to assist in tax matters and conduct annual, full-scope audits further demonstrates that they took reasonable steps to comply with all of Eagle Trim's legal tax obligations, including the

timely payment of trust-fund taxes. We acknowledge that Eagle Trim, not WCD, was ultimately responsible for its financial statements and payment of taxes. But we find nothing in the record that would cause us to question the reasonableness of Byrne and Kus's reliance on WCD's competency. The district court reasoned that Byrne and Kus could not rely on Drake's October 2000 letter to the IRS, in which he stated, "[Eagle Trim] ha[s] in fact paid all of [its] deposits in full and on time since [June 14, 2000, which] should indicate that [it is a] responsible taxpayer[]." According to the district court, because Drake did not say in the letter whether he investigated Fuller's story, Byrne and Kus could not reasonably have relied on this letter. That is, the district court's logic is that Byrne and Kus could not reasonably rely on any of WCD's statements after notice of Fuller's prior failures to pay the trust-fund taxes on time. Because Byrne and Kus had no prior indication of errors or inaccuracies in WCD's auditing, we hold that their reliance on WCD's representations was reasonable.

Third, while WCD noted in its December 2000 audit report that Eagle Trim had been delinquent in paying its trust-fund taxes for the first quarter of 2000 and that deposits for the second quarter of 2000 were late, WCD confirmed that Eagle Trim's "financial statements . . . [were] fairly presented in conformity with generally accepted accounting principles." WCD also opined that Eagle Trim had accurately disclosed "[p]ending or anticipated tax assessments or refunds, price or profit renegotiation, other potential or pending claims, lawsuits by or against any branch of government or others[.]" WCD's audit report also concluded that "there ha[d] been no . . . [f]raud involving management or employees who have significant roles in internal control."[9] Of course, in March 2001, WCD withdrew its December 2000 audit report "[f]ollowing the discovery in January 2001 that Bernie Fuller had been making a series of incorrect, inaccurate and/or fictitious entries." Thus, even licensed CPAs, who had spent several weeks at Eagle Trim performing a full-scope audit, missed Fuller's inaccurate accounting entries. Anthony Pierfelice, one of the crisis management consultants, confirmed that by the time GMAC and BBK took control of Eagle Trim's finances, "it took several months to gain an understanding of the full amount of the tax liability." In fact, Pierfelice stated that "[i]t was not until after the

---

[9]We cite this report not to find that Fuller acted fraudulently or perpetrated a fraud upon Eagle Trim or its management, but to explain that Byrne and Kus took reasonable steps to correct mismanagement of Eagle Trim's finances.

bankruptcy that [the crisis management firm] w[as] able to meet with the IRS and reconcile the amounts outstanding."

We cannot say that Byrne and Kus acted unreasonably or held an unreasonable belief that Fuller had begun to pay the trust-fund taxes on time, given that WCD, a CPA firm, did not detect Fuller's suspect financial accounting after having performed a full-scope audit and that it took several months for a crisis management firm to determine the exact amount of Eagle Trim's tax liability. Short of Byrne and Kus's personally contacting the IRS to verify the status of Eagle Trim's trust-fund tax liability or their firing Fuller upon the first or second notice of an irresponsible action by Fuller, we are hard-pressed to articulate what additional measures they could have taken.

The immediately preceding discussion shows why the district court's heavy reliance on *Jenkins v. United States*, 101 Fed. Cl. 122 (2011), *aff'd by Jenkins v. United States*, 484 F. App'x 511 (Fed. Cir. 2012), was misplaced. In *Jenkins*, the plaintiff, who was the CEO and CFO of a magazine-publishing corporation, learned in April 1995 that the corporation had failed to timely pay trust-fund taxes to the IRS. 101 Fed. Cl. at 127. But he also relied on the assertion by the president of the company that the tax delinquency had been remedied, admitting under cross-examination that he did nothing to verify the president's claims that the taxes were being paid. *Id.* at 127 n.10. Jenkins testified that he did not actually know of the corporation's tax problems until June 1995 and was therefore not willful for purposes of § 6672(a), or, alternatively, liable for payment of trust-fund taxes prior to June 1995. *Id.* at 127.

The Court of Federal Claims rejected Jenkins's argument. *Id.* at 134. It held that once he knew that the president "was unreliable in ensuring that proper and timely tax payments would be made," Jenkins "could no longer operate on the good faith belief that [the corporation and president] would ensure that the back taxes were paid." *Id.* at 135. From the point at which Jenkins learned that the president could not be relied upon to pay the trust-fund taxes, he "should have monitored whether the taxes, in fact, were being paid, and taken corrective action if they were not." *Id.* (footnote omitted). By failing to take any corrective action, Jenkins "recklessly disregard[ed] . . . a known risk that the taxes were not being paid," *id.*, and because he was a

"responsible person," the Court of Federal Claims found him "liable for the 100 percent penalty assessed under section 6672(a) of the Code," *id.* at 138.

Unlike the CEO in *Jenkins*, who issued himself a check after learning that the company was delinquent in paying the trust-fund taxes, Byrne and Kus had no ability to pay the IRS, let alone themselves, once they actually learned or had reason to know of the trust-fund tax deficit for the third and fourth quarters of 2000. Also unlike the CEO in *Jenkins*, Byrne and Kus did not simply take Fuller at his word regarding Eagle Trim's tax compliance. Byrne and Kus directed their independent accounting firm to instruct Fuller on how to timely deposit trust-fund taxes, added an assistant controller to help Fuller in his duties, created a new management spot to review Fuller's financial management of the firm, and relied on WCD's clean audit report that the financial statements were free of material misstatement.

## V. CONCLUSION

We share the IRS's concern that Congress intended for § 6672 "to protect the government against losses," *Gephart*, 818 F.2d at 473, but we must balance this goal against the unfairness of imposing too strict a rule of liability. Here, the government has successfully argued that Byrne and Kus were negligent. But, based on our review of the record, we are convinced that Byrne and Kus have met their burden in demonstrating that their negligence in believing that Eagle Trim's trust-fund taxes were being paid for the third and fourth quarters of 2000 did not rise to the level of recklessness.

Accordingly, we vacate the district court's opinion and remand for further proceedings not inconsistent with this opinion.[10]

---

[10]The Appellants claim that they are entitled to reimbursement of the tax refunds and settlement proceeds seized by the United States for satisfaction of Eagle Trim's payroll tax liability for the second quarter of 2000. However, our holding applies only to the third and fourth quarters of 2000. We therefore remand this question to the district court.