RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

No. 17-2273

*v.*

JON R. HARTMAN,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
2:16-cv-11002—Mark A. Goldsmith, District Judge.

Decided and Filed:  July 25, 2018

Before: SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Thomas A. Klug, KLUG LAW FIRM, Okemos, Michigan, for Appellant.  Teresa E. McLaughlin, Marion E.M. Erickson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge.  After Jon Hartman and Dan Ott co-founded Spectrum Tool & Design, they divvied up management responsibilities.  Ott was supposed to handle the company's payroll taxes, a task that required him to withhold federal taxes from employees' wages and send the money to the Internal Revenue Service on a regular basis.  When Spectrum encountered financial difficulties, however, Ott failed to pay the taxes several times in 2004 and 2005.  After Spectrum went bankrupt, the government sued Hartman to recover the unpaid taxes,

and the district court granted the government's motion for summary judgment. Because Hartman "willfully" failed to pay Spectrum's taxes, we affirm.

I.

This case revolves around a facet of life familiar to any American who receives a paycheck: tax withholding. Federal law requires employers to withhold taxes from their employees' wages to account for the income, Social Security, and Medicare taxes each individual owes. Known as "payroll taxes" or "trust fund taxes," they represent an essential means by which the federal government collects taxes from its citizens. *See Slodov v. United States*, 436 U.S. 238, 243 (1978). So essential, the federal government imposes personal liability for outstanding payroll taxes on anyone who (1) was "required to" pay these taxes and (2) "willfully" failed to pay the funds to the Internal Revenue Service. 26 U.S.C. § 6672(a).

After co-founding their business, Hartman and Ott initially relied on an outside automated payment company to manage Spectrum's payroll. Hartman told the company the number of hours his employees worked and their wages. And the company told him the amount Spectrum owed (including corresponding payroll taxes) and issued checks for his signature.

In December 2003, Spectrum could not afford to pay its employees' wages and the appropriate payroll taxes. When the automated payment company learned about the shortfall, it dropped Spectrum as a client. Hartman and Ott made arrangements to pay their employees' wages but not the payroll taxes. Hartman delegated responsibility for managing future payroll taxes to Ott, who chose to handle the task himself with the help of a software program called Peachtree. Hartman continued to sign the company's other checks, including employees' wages.

Hartman realized something was amiss when he found unmailed checks made payable to the Internal Revenue Service on Ott's desk in July 2004. Hartman confirmed that Ott had not been paying Spectrum's payroll taxes. Hartman phoned the Internal Revenue Service and met with an agent, who informed him that Spectrum should pay its current taxes going forward and make up the shortfall over time. In October, the Revenue agent told Hartman that Spectrum still was not paying its current taxes.

Hartman nonetheless left Ott in charge of the company's payroll obligations, convinced his partner had paid the payroll taxes after seeing notations to that effect when he reviewed entries in Peachtree, the company's accounting software. Hartman's "best guess" was that Ott paid the older back taxes instead of Spectrum's ongoing payroll obligations, perhaps misapprehending the agent's instructions. R. 21–2 at 34. When Hartman and Ott met with the Internal Revenue Service agent again in October 2004, Hartman signed tax forms under penalty of perjury that spelled out Spectrum's delinquencies, though Hartman claims that he did not prepare or review the forms.

After Hartman met with the Revenue agent a second time, he realized the company could not pay the government what it owed. Hartman sought the advice of a tax attorney, who advised Spectrum to seek protection under Chapter 11 of the Bankruptcy Code. Hartman did just that in January 2005. After the filing, Hartman continued to rely on Ott to remit Spectrum's taxes.

Through subsequent disclosures to the bankruptcy court, Hartman acknowledged that Spectrum had not paid some of its post-bankruptcy payroll taxes. By March 2005, Hartman and Ott agreed to stop remitting payroll taxes. Hartman did not replace Ott for another five months or independently review the company's payroll obligations. Even after Hartman fired Ott in August 2005, Hartman still kept Ott in charge of their company's payroll.

In July 2005, Spectrum hired a company to handle its invoices and to earmark ten percent of every invoice to pay outstanding taxes. The arrangement was too little too late. After the Internal Revenue Service objected to Spectrum's Chapter 11 plan, the company converted its Chapter 11 bankruptcy into a Chapter 7 liquidation in October 2005.

The government filed this lawsuit against Hartman to recover Spectrum's unpaid payroll taxes for two periods: the quarterly period ending December 2004 (before Spectrum filed its bankruptcy petition) and the quarterly periods ending March, June, September, and December 2005 (after Spectrum filed its bankruptcy petition).

The district court granted the government's motion for summary judgment, ruling as a matter of law that Hartman was responsible for remitting Spectrum's payroll taxes and that he recklessly disregarded an "obvious risk" that his company was not paying those taxes. Because

the district court held that Hartman acted recklessly, it declined to determine whether Hartman actually knew that the taxes had gone unpaid.

## II.

The government may recover outstanding payroll taxes from anyone who (1) was "required to" remit payroll taxes and (2) "willfully" failed to pay them to the Internal Revenue Service. 26 U.S.C. § 6672(a). Hartman acknowledges that he was required to pay the taxes, making him what case law refers to as a "responsible person." *See Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir. 1993). But did he "willfully" fail to pay those taxes?

A responsible person may willfully fail to pay taxes in one of two ways. He may know that the company did not pay the taxes. Or he may "deliberately or recklessly disregard[] facts and known risks that the taxes were not being paid." *Calderone v. United States*, 799 F.2d 254, 260 (6th Cir. 1986). Negligence, even gross negligence, does not establish willfulness. *Byrne v. United States*, 857 F.3d 319, 327–28 (6th Cir. 2017). A responsible person thus cannot act recklessly (and therefore willfully) if "he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *Id.* at 329 (quotation omitted).

Hartman acted willfully in this instance by repeatedly claiming to believe that Ott paid the taxes when he no longer had any plausible basis for thinking that was so. He knew of Ott's past failures and had ample means to identify and remedy Ott's misconduct.

Think about the uncontested chain of events that preceded the failure to pay the taxes in December 2004, before the company filed its bankruptcy petition. In December 2003, Hartman knew that Spectrum missed a payroll payment. In July 2004, Hartman found the undelivered checks on Ott's desk and learned about Spectrum's delinquency from the Internal Revenue Service agent. In October 2004, Hartman learned again that Ott had not been paying the taxes properly. Faced with Ott's extensive track record of misconduct, Hartman had no plausible basis for continuing to trust Ott to remit the payroll taxes.

Hartman faces similar problems with respect to Spectrum's failure to pay payroll taxes after the bankruptcy filing. By then, Hartman knew of Ott's past intentional failings. But even

as Hartman learned about Spectrum's mounting delinquencies, he still asked Ott to maintain responsibility for the company's taxes. By March 2005, Hartman and Ott agreed to stop paying payroll taxes altogether. Viewed in its most charitable light, Hartman's faith in his partner was hope against reason or, worse, hope based on the assumption that Ott would relieve the company's cash crunch by stiffing the government. Either way, Hartman acted (at least) recklessly as a matter of law.

*Byrne v. United States* does not fix these problems. After two responsible persons learned about their controller's failure to remit payroll taxes, the *Byrne* officers took meaningful steps to identify outstanding debts and remedy their accounting practices. They hired "an independent, professional accounting firm," which "performed a full-scope audit" and failed to uncover the controller's widespread misconduct. *Byrne*, 857 F.3d at 332–33. Then they hired an in-house accountant to assist the controller and a chief financial officer to oversee the controller. *Id.* at 332.

To Hartman's way of thinking, he acted the same way by contacting the Internal Revenue Service for advice in July 2004. But that is a far cry from hiring an in-house accountant and a chief financial officer to answer the government's dunning requests. Revenue agents at best can inform taxpayers about the extent of their past liabilities and a path forward. But they cannot monitor a company's ongoing compliance with the diligence of a full-time employee. And that it is not what Hartman asked the agent to do anyway.

In a similar vein, Hartman argues that his continued trust of Ott mirrored the *Byrne* taxpayers' reliance on their controller, even after learning of some of the controller's mistakes. But the *Byrne* taxpayers did not blindly trust their controller. They hired additional staff and an outside independent accounting firm. Night and day separate the two approaches. *Id.* at 332–33.

Hartman compares Spectrum's bankruptcy filing to the *Byrne* taxpayers' bankruptcy filing. But the *Byrne* taxpayers established a lack of willfulness by hiring two employees to supervise their deficient controller and by relying on a clean bill of health from a professional accounting firm. Declaring bankruptcy had nothing to do with it.

After October 2004, Hartman insists, he "carefully monitored the financial reports . . . within the company's software." Appellant Br. at 7. But given Ott's serial instances of misconduct from July 2004 onward, that does not suffice to show a lack of recklessness. By that point, Hartman needed to reconcile the electronic ledger with proof that Ott paid Spectrum's taxes—not with proof that the software program had identified the amount due.

We affirm.